## COMMONWEALTH *vs.* WILLIAM S. TUCKERMAN.

The treasurer of a railroad corporation is an "officer, agent, clerk or servant of an incorporated company," within the Rev. Sts. *c.* 126, § 29, relating to embezzlements by such persons.

A treasurer of a railroad corporation, who had embezzled their funds, called upon a friend of his, who was a surety upon his official bond and stockholder in the corporation, for advice; and he urged him to go to the directors, and make a clean breast of it, and told him that it would be for his interest to make a full confession; but said nothing, in terms, of a prosecution; told him that the disgrace was in doing wrong, not in suffering punishment for it, and he had better stay and meet the punishment; and (as he testified) "advised him as a friend, a son." The next day they went together to see one of the directors, who, on this stockholder suggesting that he had influence with the other directors and could prevent a prosecution, stopped him, saying that he could and would make no promises, did not know what his own power or duty was, but would do all he rightfully and properly could to prevent his arrest and prosecution, and that he must confide wholly in him and his discretion. *Held,* that confessions made after these conversations were admissible in evidence against him.

If money of a railroad corporation is received by their treasurer, and by him deposited to his credit as such treasurer, and afterwards drawn out by him either in bills or coin, such bills or coin are the property of the corporation, and, while in the hands of the treasurer, subjects of embezzlement by him; and if he afterwards, while still treasurer of the corporation, fraudulently converts such money to his own use, without their consent or knowledge, and without claim of right, it is embezzlement; although the guilty intent does not exist at the moment of drawing the money out of the bank, but is formed afterwards; and although at the time of the fraudulent conversion he intends to restore the amount, and has property sufficient to secure its restoration.

Upon the trial of an indictment for embezzlement, other previous acts of a similar character, enumerated with the one charged in the indictment in a paper drawn up by the defendant as a statement of all sums taken by him, are admissible in evidence to show the intent with which the act charged was committed.

It is not necessary, in order to constitute embezzlement, that there should be a demand of the money alleged to have been embezzled, or a denial of its receipt, or any false account given of it, or false statement or entry concerning it, or refusal to account for it.

INDICTMENT on the Rev. Sts. *c.* 126, § 29, against the treasurer of the Eastern Railroad Corporation for embezzling bank bills for $5000, the property of the corporation. Trial in the municipal court of Boston at December term 1856 before *Abbott,* J.

The attorney for the Commonwealth called John B. Parker, for the purpose of proving confessions of the defendant. The defendant's counsel objected that these had been obtained and made under the influence and by means of encouragement and menace ; and, to establish this, called and examined Benjamin

15 *

T. Reed, for the purpose of proving that he had advised and
encouraged the defendant to confess upon a promise and encour-
agement that it would be better for him to do so, and worse for
him if he did not; and for the purpose of proving that it was
under the continuing influence of hope and fear thus excited
that the defendant made confessions in the hearing of Parker.

Reed testified as follows: " I was treasurer and director of
the Eastern Railroad Corporation for some years, and continued
a director until two or three years since. On the evening of the
27th of June 1855, at which time I held stock in that corporation,
though not in my own name, the defendant came to my house at
Lynn, late in the evening. His wife was with him. After sitting
half an hour, they rose to go home. I went with him towards the
stable, where his horse was standing, to see them off. He said
nothing until his wife, addressing him, said, ' William, why don't
you tell Mr. Reed what you came for?' He made no reply, but
began to cry. He then said something, the substance of which
was that he was in trouble and wanted my advice. I asked him
if he was a defaulter. He said he had loaned money of the East-
ern Railroad Compal.j, and could not get it back as it was prom-
ised and as he had expected, and in the time when it would be
wanted, and that he had deceived me, or had imposed on me.
I said he had better go to the directors directly, and make a
clean breast of it. The exact words I do not remember; but the
substance and purport was, it would be for his interest to go and
confess all, and afford all the assistance he could. This was re-
peated over and over. I said it would be for his interest to go
and make a full confession. The expression ' clean breast' was
one of the very first expressions I used. I felt great distress and
earnestness, and I suppose my manner expressed it. I arranged
with him to meet Mr. Hooper the next morning, that he might
make a statement which should be fuller than he made to me.
By my procurement Hooper came to my office the next morn-
ing, and there Tuckerman met him. I then told Hooper that 1
had said to Tuckerman he had better make a confession of all
he had done. I left him and Hooper together. He resigned his
office of treasurer that day; but he continued to remain in the

office for some weeks, assisting, making explanations to the directors and the committee. I never said or did anything, and do not know that any one did, to efface the impression of encouragement or hope which I thus made."

Upon cross-examination Reed testified : " He said, in answer to my question, that he had used the money for other purposes than those of the corporation. I said, Go to the directors, I can't help you. His wife said she had heard of it that evening at Watertown, and could not sleep till she had made him come down and ask my advice. I told him to commit no violence on himself, nor run away ; that the disgrace was in doing wrong, not in suffering punishment for it; he had better stay and meet the punishment. I advised him as a friend, a son. He had been my clerk for ten years. I told him it would be for his interest to go and make a full confession. I know I used words which conveyed that meaning in substance. I said nothing, in terms, of a prosecution. I did not go into details. I asked the amount. I think I went up as high as $20,000. He did not know, or did not say, the full amount. I advised him to meet Hooper as a principal director. He engaged to do so. I told him he had better go and make a clean confession and a clean breast of it. Hooper said nothing to Tuckerman in my presence."

On reëxamination Reed said : " He named no sum until after I advised him to make a confession. He made no allusion to any sum received of Ruel Williams ; no allusion to this $5000 said to be drawn on the 26th of June. I told Hooper the next morning what I had advised Tuckerman, and repeated it all in presence of both. · I procured him this office of treasurer, and was one of his sureties. The bond was $20,000."

The counsel of the defendant thereupon contended that this evidence established a legal cause for rejecting the confessions offered, and objected to their admission. But the court overruled the objection, and admitted the evidence, " not upon the ground that the influence, if any was ever created, did not continue until the time when the confession was made to Parker, but on the ground that the facts appearing in the testimony of Reed were

insufficient to exclude confessions." Parker was then admitted to testify, and gave evidence of confessions by the defendant which were material in the case.

The attorney for the Commonwealth then called Samuel Hooper, and offered to prove confessions made by the defendant to him upon the 28th of June 1855. To this evidence the defendant's counsel also objected, upon the ground that the confessions made to him were obtained and made under influence, and by means of encouragement and menaces, which menaces, encouragements and inducements they claimed had been made or held out by Hooper, and by Reed in the presence of Hooper; and for this purpose they were permitted to examine Hooper upon his *voir dire,* when he testified as follows:

" I went to Mr. Reed's office on the morning of June 28th, by request of Reed, to meet the defendant. The defendant was there. Reed was there. The defendant was in great distress, excited. Reed urged him to tell me the whole story. The defendant was weeping, greatly agitated. Reed urged the defendant to make a full confession; said I had influence with the directors, and would see that he was not complained of or arrested. I told Reed to stop there; said I neither could nor would make any promises; I had no power to bind the directors; that I had no vindictive feelings against him; that he knew me and must confide in me to do what was right; that I neither knew what my power or my duty was; that I did not know what was right to do. The defendant was reluctant to speak for a good while. Reed tried very hard to persuade the defendant. I told him I had not the power; was only one of the directors, and did not know what was proper and right for me to do. I was on the finance committee, and considered I was there as one of the committee. I told him I had not the power, but had no vindictive feeling, and would do all in my power that I properly could do to prevent his arrest, or any proceedings by the directors, and I have no doubt that I expressed to him in substance what I intended to do. After some considerable time, half an hour's talk or so, the defendant seemed to change and make up his mind. My object was to ascertain the

Commonwealth *v.* Tuckerman.

condition of the affairs of the company. He was not in a condition to make a statement in detail at that time, nor I to receive one. He made at that time a general statement of his defalcations as treasurer, and said he had the means at home of making an exact and detailed statement of them, which would be accurate, and I told him to make out a written statement, and that any favor to be shown him by the directors, if any, would depend on that statement's being full and correct. I told the defendant I would make no promise of any kind; he must confide entirely in me, and I would do all I rightfully and properly could to prevent his arrest, or his being arrested."

On cross-examination Hooper said : " I said I would make no promises; he must confide in me that, unless I was required by my duty to do so, I should not have him arrested. I told him throughout the interview I neither could nor would make any promises; that he must confide entirely in me, and my discretion, and that I should do in every respect precisely as my judgment and discretion should direct me ; that I neither knew what I had the power to do, nor what was right for me to do."

It also appeared that at this time no suspicion had been entertained of the defendant by the officers of the company ; that he was under no arrest; that no complaint had been made; and that he met Hooper in consequence of what passed between him and Reed at the interview testified to by Reed.

On reëxamination Hooper testified : " The defendant was in such a condition of mind and feeling on the 28th, that I did not wish to rely upon the details of his statements ; I did not think them at all to be depended upon. He said nothing then of the sum of $5000 received of Ruel Williams, or of any sum drawn from the bank on that day. I never heard anything of that until the 29th, when, finding an entry of $5000 on the 26th, I inquired of him concerning it. I arranged with him on the 29th to remain and assist the directors upon, from and after that day, by his explanations and corrections. He did stay, and did assist constantly and faithfully, as far as I knew ; and the directors did not, nor any of them, nor any of the committee of investigation, institute this prosecution."

Reed, on being recalled, testified that he fully understood Hooper to say to Tuckerman that he must confide in him; that if he made a full and clear statement, he might be relied on.

The defendant's counsel contended that this evidence established legal cause for rejecting the confessions as obtained and made under the influence of promises and threats; and objected to their admission. But the court overruled the objection, and admitted the evidence; and Hooper then testified to confessions of the defendant which were material in the cause; and among other things stated that the defendant exhibited and explained to him a written list (which was produced at the trial) of the different amounts of the property of the company which the defendant had appropriated to his own use; and that he explained the last item upon the list, which was " June 26th, $5000," to be $5000 drawn from the Merchants' Bank, originally received from Ruel Williams, and the subject of this indictment.

The evidence in the case tended to show that on the 26th of June 1855 the defendant, as treasurer of the Eastern Railroad Company, received from Ruel Williams $5000 towards a debt due to the company; that he deposited it the same day in the Merchants' Bank to his credit as treasurer of the company, and duly entered the fact of the receipt, and the source from which it came, and the debit thereof upon its deposit, to the Merchants' Bank; that he drew his check on the same day as treasurer of the Eastern Railroad Company upon the Merchants' Bank for $5000, which was paid out on that check to some one; that this check was not entered by the defendant in the books of the company until after his confessions to Hooper, when he charged the amount of it to himself; that it was the defendant's uniform practice not to make entry of money drawn from the bank until he applied it to the making of payments for the company, when he charged it to the accounts to which he had applied it; that in his confession and statement to Hooper on the 29th of June he represented that, of the $5000 so drawn, he changed $3000 into smaller bills to use for the purpose of going to Canada, when he had contemplated going to Canada, but was induced to abandon this intention, and he had

them in a safe place, and said he would give them to Hooper, which he subsequently did on the 5th or 6th of July; and that the $2000, balance of the said $5000 drawn on said check, he had used for pressing purposes of his own, which he refused to disclose, and never did disclose.

The counsel for the government offered to give in evidence acts of embezzlement of the property of the Eastern Railroad Company, other than and distinct from that charged in the indictment, and committed by the defendant on different days and times, from six months to four years before the act charged in the indictment, while the defendant was treasurer of the corporation. To this evidence the defendant's counsel objected. But the acts were admitted by the court, " so far, and only so far, as they were contained or referred to in the written statement made by the defendant to Hooper, one item of which was the subject of this indictment; not for the purpose of proving, or as having a tendency to prove that the defendant took the money charged in the indictment; but for the purpose of showing that if he took it, it was done with the fraudulent intent to convert it." Evidence was accordingly given, against the defendant's objection, tending to show that the defendant had from time to time embezzled moneys, notes and other similar property of the Eastern Railroad Company, of different amounts and at different times, amounting in all to $174,000; and had concealed the same from time to time, by entries, or omission of entries, in the books and accounts of the corporation, and in trial balances rendered by him to the corporation.

The defendant's counsel presented to the judge many prayers for specific instructions, one of which was " that the treasurer, in regard to moneys or funds under his control and administration, including such funds as were deposited or drawn on the 26th day of June, is not such an officer or agent that the indictment alleging embezzlement of the property of the corporation can be maintained against him ; " and the others, as they contended, involved the doctrine that there could be no embezzlement if there was no demand of the money, no denial of the receipt of it, and no false account given of it; and that, in order to con-

stitute embezzlement, there must be some false entry or false statement, or an express or implied refusal to account.

The judge refused to give the instructions prayed for; and instructed the jury "that, in order to make out the offence charged, the government must prove that the defendant, while treasurer of said company, fraudulently converted to his own use the whole or some part of the money described in the indictment, which was the property of said company, and which had been entrusted to him as their treasurer, and that this conversion was without the consent or knowledge of said company, and without claim of right on the defendant's part, and that this conversion took place while the defendant was treasurer of said company; that if the jury were satisfied that such conversion took place at some time, but were in reasonable doubt whether it was before or after the defendant ceased to be treasurer, it would be their duty to acquit him; that the money converted must be the property of said corporation; and upon this part of the case, if money was deposited in a bank by the defendant to his credit as treasurer of said company, which belonged to said corporation, and the defendant after such deposit drew his check upon the bank, and received the amount of it in bills or coin, either from the bank or any other person who might take it and receive the amount from the bank, the bills or coin so received upon said check would be the property of said corporation, while in the hands of the defendant as their treasurer, and the subject of embezzlement by him, if the other facts necessary to make out the charge were proved; that the government must make out a fraudulent taking and conversion; that what was universally understood· by the term 'fraudulent' as well defined the character of the conversion to be proved, as any form of expression — it must be attended and characterized by some deceit, concealment or trick; that proof of a neglect to account for money received by the defendant as treasurer, or proof of a taking and conversion of money of the corporation, did not constitute, in and of itself, the crime of embezzlement, or, alone and unattended by any other circumstances, was not sufficient evidence of it; that the non-accounting might

be from accident, forgetfulness or carelessness; or the conversion might be under a *bona fide* claim of right, however groundless, that in fact the non-accounting or conversion by the defendant would only be evidence which the jury were to consider in connection with all the facts and circumstances proved, as bearing on the question of fraudulent intent; that upon this part of the case, taking all the evidence put in, the jury were to be satisfied, not only of the conversion, but that it was with a fraudulent intent; but if the jury were satisfied that the defendant, acting as treasurer, took and used the money of the corporation, intrusted to him, for his own purposes, either by appropriating it to his own personal wants, or by lending it to third persons on his own account, and did this, knowing he had no right so to do, without the consent of said company or their officers, and concealing such conversion from them, it would amount to a fraudulent conversion of the money of the company, although at the time of such taking the defendant intended to restore what he had so appropriated, before it should be known, and believed he should be able to do so, and had in his possession property sufficient to secure the full amount so taken; that in reference to other acts of embezzlement, which had been put in evidence, they were only to be considered by the jury in passing upon the intent with which the money charged in the indictment was converted, if converted at all; that the conversion must be first proved by other distinct and independent evidence, and those other instances of embezzlement were not to be used or considered in deciding the question of taking, but only in passing upon the intent, if the conversion was first established by other testimony; that upon the question whether the whole $5000 described had been fraudulently converted, or only a portion of it, the rule of law applicable to it would be this; that if it was proved that the defendant drew a certain amount of money belonging to the company from the bank, where it was deposited usually and in his name as treasurer, and took the money into his own possession, for the purpose and with the design of appropriating it to his own use and putting it out of and beyond the control and power of the company, and concealed such

drawing from the company and its officers, and then changed the bills so drawn by him, for more convenient use for his own purposes, and absolutely used and appropriated a portion of it to his own wants, and kept the rest, not so used, concealed from and out of the control of the company and its officers for some length of time, it would amount to a fraudulent conversion of the whole sum so drawn, although a part of it was never beyond the defendant's control, and was afterwards restored by him to the company after such facts had been communicated to the officers of the company; that upon these several propositions the burden of proof was upon the government; that although the court had decided the evidence of the confessions of the defendant competent to go to the jury, the weight of the testimony so admitted was a question solely for them, and, in passing upon the degree of credit and weight to be given to the evidence, they were carefully to consider all the facts and circumstances under which the confessions were made, and if they came to the conclusion that such circumstances proved were sufficient to cast suspicion and doubt upon the evidence, they had the right to disregard it entirely in passing upon the questions before them."

The jury returned a verdict of guilty of embezzling bills of the Merchants' Bank of the amount and value of $2000, as set forth in the indictment, and the defendant alleged exceptions.

*J. A. Bolles*, (*R. Choate* with him,) for the defendant. 1. The defendant, as treasurer of the Eastern Railroad Company, was not an " officer, agent, clerk or servant of any incorporated company," within the meaning of Rev. Sts. *c.* 126, § 29, relating to embezzlement.

2. The confessions made to Parker and Hooper were not voluntary, but were made under authorized inducements, of a personal application and of a temporal character. Joy on Confessions, 4, 5, 23 & seq. *Commonwealth* v. *Morey*, 1 Gray, 461. *Commonwealth* v. *Taylor*, 5 Cush. 605. *State* v. *Grant*, 22 Maine, 171. *State* v. *Crank*, 2 Bailey, 66. If the defendant was or may have been brought to confession by the induce-

ments, the form of words is immaterial. *Commonwealth* v. *Knapp*, 9 Pick. 496.

Whatever Reed promised in Hooper's presence, unless contradicted, must be taken as said by Hooper. *Regina* v. *Luckhurst*, 6 Cox C. C. 243. *Regina* v. *Taylor*, 8 Car. & P. 733. *Regina* v. *Laugher*, 2 Car. & K. 225. *Regina* v. *Garner*, 2 Car. & K. 920. Reed, and still more Hooper, spoke with authority; both as stockholders; Reed as the defendant's friend and surety on his bond; and Hooper as director, as " principal director," as one " having influence with directors," as a member of the " finance committee," and speaking to the defendant as such. Both were pecuniarily concerned, as individuals; Hooper was officially representing the company, and, as a director, the employer and master of the defendant. As such he was authorized to offer inducements. *Regina* v. *Moore*, 5 Cox C. C. 555. *Regina* v. *Taylor*, 8 Car. & P. 733. *Regina* v. *Laugher*, 2 Car. & K. 225. Joy on Confessions, 5. *Rex* v. *Parratt*, 4 Car. & P. 570. *Rex* v. *Kingston*, 4 Car. & P. 387. *State* v. *Phelps*, 11 Verm. 116. A prosecutor is not merely he who has begun proceedings, but any one who, from his close relation to the offence, is likely to prosecute. *Regina* v. *Luckhurst*, 6 Cox C. C. 243. *Regina* v. *Moore*, 5 Cox C. C. 555. *Commonwealth* v. *Chabbock*, 1 Mass. 144. Authorized inducements, however slight, of the character specified exclude all subsequent confessions; nor is the rule varied where the defendant makes the first overtures or propositions of confessions. 1 Greenl. Ev. § 223. *Commonwealth* v. *Morey*, 1 Gray, 461. *Commonwealth* v. *Taylor*, 5 Cush. 605. *State* v. *Phelps*, 11 Verm. 116. *Regina* v. *Luckhurst*, 6 Cox C. C. 243. *Rex* v. *Kingston*, 4 Car. & P. 387. The promises made are as clearly inducements as any reported. Cases already cited. *Rex* v. *Thomas*, 6 Car. & P. 353. *Rex* v. *Walkley*, 6 Car. & P. 175. *Regina* v. *Hewett*, Car. & M. 534. *Meynell's case*, 2 Lewin C. C. 122. *Regina* v. *Garner*, 2 Car. & K. 920. *State* v. *Guild*, 5 Halst. 163.

3. The bank bills alleged to have been the property of the Eastern Railroad Company were not their property at the time of the alleged conversion, so as to be the subject of embezzle-

ment. They were not the property of the company, while in the bank. *Commonwealth* v. *King*, 9 Cush. 284. *Rex* v. *Walsh*, Russ. & Ry. 215. The defendant was not bound to pay them over to the company *in eadem forma.* Rosc. Crim. Ev. (2d ed.) 449. *Rex* v. *Taylor*, Russ. & Ry. 63, and 3 Bos. & Pul. 598. At common law, for criminal purposes, the mere possession of the servant was not the master's possession, and gave him no ownership. 2 East P. C. 568. *Commonwealth* v. *King*, 9 Cush. 288. The English statutes on the subject of embezzlement recognize and provide for this doctrine. Sts. 33 H. 6, *c.* 1 · 21 H. 8, *c.* 7 ; 15 G. 2, *c.* 13, § 12 ; 17 G. 3, *c.* 56 ; 39 G. 3, *c.* 85 ; 7 & 8 G. 4, *c.* 29, § 47. 2 East P. C. 560, 574. 1 Hale P. C. 515. The *St.* of 1834, *c.* 186, § 1, contained the same recognition and proviso. The revised statutes omit that proviso, and leave the question of ownership just as the common law left it. Rev. Sts. *c.* 120, §§ 27, 29. *Commonwealth* v. *Stearns*, 2 Met. 343. *Commonwealth* v. *Libbey*, 11 Met. 64.

4. The judge erred in admitting evidence of other alleged embezzlements, committed by the defendant from one to six years prior to that charged in the indictment, even for the purpose of proving the intent of that specific act. Rosc. Crim. Ev. 81. 1 Greenl. Ev. § 52. 1 Phil. Ev. (7th ed.) 178. Foster, 245. 2 Russell on Crimes, (7th Amer. ed.) 772. They were independent acts, and not " parts of one continued or continuous transaction ; " *Regina* v. *Bleasdale*, 2 Car. & K. 765 ; *Rex* v. *Voke*, Russ. & Ry. 533 ; *The King* v. *Ellis*, 9 D. & R. 174 ; *Commonwealth* v. *Wilson*, 2 Cush. 590 ; Best on Ev. 32, 96, 97, 285, 286 ; nor " intermixed " with the act charged ; *The King* v. *Wylie*, 1 New Rep. 92 ; nor " essential links in a chain of facts needful to be proved " in the case on trial ; *Rex* v. *Salisbury*, 5 Car. & P. 155 ; 2 Russell on Crimes, 776 ; nor a wholesale joinder of contemporaneous offences ; *Rex* v. *Mogg*, 4 Car. & P. 364. Evidence of other acts with considerable latitude of time is admitted in cases of forgery and counterfeiting to prove the guilty knowledge, but never to prove the intent, for in those cases intent is an intendment of law. *Regina* v. *Marcus*, 2 Car. & K. 356. *Regina* v. *Hill*, 8 Car. & P. 274. *Regina* v. *Cooke*,

8 Car. & P. 582. *Rex* v. *Mazagora*, Russ. & Ry. 291. And see *Barton* v. *State*, 18 Ohio, 221. But even to prove knowledge, three months is the longest recorded period. *Rex* v. *Ball*, Russ. & Ry. 132. *Regina* v. *Oddy*, 5 Cox C. C. 210, and 2 Denison, 264. *Rex* v. *Smith*, 2 Car. & P. 633. These facts were not part of the defendant's confession. *The Queen's case*, 2 Brod. & Bing. 297. *Rex* v. *Jones*, 2 Car. & P. 629. Rosc. Crim. Ev 55, 81. *Willis* v. *Bernard*, 8 Bing. 382.

5. The rulings of the court in regard to the defendant's intent and purpose at the time of the alleged conversion amounted to an instruction that every conversion made without formal claim of right is a fraud, and that from this conversion the intent to defraud must be inferred. Every conversion of corporate funds by its treasurer is not fraudulent; for he may take such funds and secrete them without embezzlement; and do this with a fraudulent intent and yet not be guilty of embezzlement. Rev. Sts. *c*. 126, § 29. Mere taking or conversion, then, is an act indifferent in itself. In such cases criminal intent is not implied by law; but the intent must be proved and found. *Rex* v. *Wood-fall*, 5 Bur. 2667. Where the actual effect of the act is to defraud, the jury may infer intent to defraud. Rosc. Crim. Ev. 21, and cases there cited. But intent must always be proved as well as every other material fact charged, either by evidence or by inference of law. 3 Greenl. Ev. § 13. Where fraud and injury must necessarily follow the act, as in forgery, the intent may be presumed from the act itself. *Rex* v. *Farrington*, Russ. & Ry. 207. *Regina* v. *Philp*, 1 Moody, 263. Rosc. Crim. Ev. 20, 21. The ruling of the court excluded all evidence of intent. *Regina* v. *Phetheon*, 9 Car. & P. 552.

6. The defendant's prayers for instructions should not have been refused. One doctrine involved in them, and overruled, is that there was and can be no embezzlement, because there was no demand of the money, no denial of the receipt of it, and no false account given. *Rex* v. *Jones*, 7 Car. & P. 833. *Regina* v. *Creed*, 1 Car. & K. 63. *Rex* v. *Hodgson*, 3 Car. & P. 423. *Rex* v. *Smith*, Russ. & Ry. 267. Another doctrine involved in one prayer, and overruled, is, that in every embezzlement there must

16 *

be some false entry, or false statement, or an express or implied refusal to account. *The King* v. *Taylor*, 3 Bos. & Pul. 596. *Rex* v. *Hall*, Russ. & Ry. 463.

*G. W. Cooley*, (County Attorney,) for the Commonwealth.

MERRICK, J. The defendant was tried in the municipal court upon a charge of having committed the crime of larceny by the embezzlement of money which came into his possession and was under his care by virtue of his employment as the treasurer of the Eastern Railroad Company. This transaction consisted in the alleged fraudulent conversion of five thousand dollars belonging to that corporation, drawn from the Merchants' Bank on the 26th of June 1855 by a check for that amount signed by him in his official capacity. The jury returned a verdict that he was guilty of embezzling bank bills to the amount and value of two thousand dollars, in manner and form as set forth in the indictment. To many of the rulings of the presiding judge he alleged exceptions; and the questions of law to which they relate are now before this court for revision and final determination.

1. One of these exceptions lies at the foundation of the prosecution against the defendant. It rests upon the denial that at the time of the alleged embezzlement he was in any such employment, or held any such office, as would enable him to commit the offence. In one of the prayers for special instructions to the jury, the judge was asked to rule, that the treasurer of the Eastern Railroad Company, in regard to money and funds under his control and administration, including such funds as were deposited or drawn on the 26th of June, was not such an officer or agent of the corporation that an indictment alleging embezzlement of its property could be maintained against him. If this rule had been adopted by the court, it would necessarily have ensured the acquittal of the defendant; for it asserts that the provisions of § 29 of *c.* 126 of the Rev. Sts., under which he was indicted, is inapplicable to any person holding the office of treasurer in a railroad corporation; and that no misappropriation, or conversion to his own use, of the money or property intrusted to him in his official capacity, however fraudulent or

dishonest, and with whatever intent or purpose it may have been done, would or could constitute the crime of embezzle-ment. But the court declined to accede to this request of the defendant, and on the contrary ruled that the prohibition and penalties of this section of the statute extended to such officers, and that they were clearly embraced in the terms in which its provisions were expressed.

In the argument of the counsel in support of the exceptions no great reliance was placed upon this objection. Indeed we are not sure that it was not their purpose to waive it altogether. But we do not feel at liberty, in a matter of so great impor-tance, wholly to overlook and disregard the objection on this ground alone, since if it could be maintained it would be fatal to the prosecution.

That part of the statute under which the defendant is in-dicted provides that if any officer, clerk, agent or servant of any incorporated company shall embezzle or fraudulently convert to his own use, or shall take or secrete with intent to embezzle or convert to his own use, without consent of his employer or master, any money or property of another which shall have come into his possession, or shall be under his care, by virtue of such employ-ment, he shall be deemed by so doing to have committed the crime of simple larceny. Rev. Sts. c. 126, § 29. The treasurer of a railroad company is an officer distinctly recognized by law. He is to be chosen by the directors, and is required to give bond for the faithful discharge of his trust in such sum as the by-laws of the company shall require. Rev. Sts. c. 39, § 49. Being therefore within the very words of the statute, he must be con-sidered as liable to the penalties prescribed for its violation, un-less upon some reasonable principle of interpretation he is not to be accounted as one of the several parties against whose mis-conduct it was the object of the legislature to provide guards and security. It would certainly seem, not less from the course of legislation on the subject, and the mischief to be provided against, than from the literal meaning of the words of the statute, that the treasurer of a railroad corporation is comprehended in one of the classes of persons who, by a fraudulent conversion of prop-

erty entrusted to their care, are to be deemed to have thereby committed the crime of larceny. The twenty-ninth section of *c.* 126 of the Rev. Sts. is a reënactment of the provisions of the *St.* of 1834, *c.* 186. But there is one significant and decisive change in its phraseology. While the former is only in general terms, the revised statutes mention particularly the " officers and agents of any incorporated company " as parties to whom its provisions shall extend. They were specially mentioned probably to remove any doubt which might be entertained upon the question whether they were embraced in the more general language of the former statute. The commissioners by whom the revision was made do not appear to have intended to enlarge or change the class of persons by whom embezzlement might be committed. Nothing of that kind is alluded to in their notes. Commissioners' Report of 1835, *c.* 126. This specific change in the language of the former statute only makes it certain that every officer of an incorporated company, to whose care property is entrusted by his employer, occupies a position in which he is to be considered capable of committing acts of embezzlement, and liable to the penalties which the law has assigned as the punishment of the offence.

The only consideration which has ever, as far as we know, been suggested as having a tendency to show that upon a true interpretation of the statute treasurers of incorporated companies are not comprehended under the general term of " officers " who are made liable to its penalties is, that on account of their peculiar employment and the nature of the duties they are required to perform, they are necessarily themselves the masters of all the property of which they come into the possession or have the care, and that they cannot therefore either embezzle, secrete or fraudulently convert it without the consent of their employer or master. This is a mistake ; no such difficulty exists. To some extent it is true that a treasurer, being a keeper of cash and responsible for it, has for the time being the exclusive right of possession, control and disposal. Unless he is restrained by some rule prescribed for the government of his official conduct, or by the orders of those to whom in the dis-

Commonwealth *v.* Tuckerman.

tribution of the powers and duties of the corporation for whom they all act he is made subordinate, he may keep the money, of which he obtains possession by virtue of his office, in the manner and in the place which he shall himself prefer — in any place where under a sense of his responsibility he may consider it, however erroneously, the most secure and the most readily available for any purpose to which those to whom it belongs shall devote it. But in doing this he is only executing a trust. He is not managing anything which is his own, but only controlling, within the legitimate limits of his official authority, for the benefit of the owner by whom he is employed, the property entrusted to his care. And in this particular, excepting merely the kind, and it may be the value, of the property respectively possessed, his powers, duties and obligations do not in the least degree differ from the powers, duties and responsibilities of the clerks, agents and servants of the same employer. They are severally, for the time which they hold possession of anything committed to them to keep, as much masters of it, as he in the same sense is master of the money with which he is entrusted. Both and all of them are to act, in their several relations, with strict fidelity to their employer; and every species of property is to be kept by them respectively upon the terms and according to the directions given them concerning it. The clerk who has the custody of books and papers, the agent to whom is given the general control of all the effects of his principal, the servant who in a more limited sphere is entrusted with goods for any specific purpose, has each within the circle of his authority a right of control as clear and absolute as that of the treasurer in the discharge of the duties which devolve upon him in a higher and more responsible department of service. They are therefore all alike included in the scope and purposes, as well as in the literal meaning of the comprehensive words of the statute. And surely, if there be any reason to discriminate between different ranks and classes of service, to no one of all those who may be in the employment of a corporation, of copartners or of individual proprietors, can there be a higher reason or more stringent occasion for applying the

restraint of penal laws to insure fidelity than to him who is specially entrusted with the care of money. Of every species of property, this is the most easily concealed, misapplied, converted to use and embezzled. Being at all times available for the purposes either of business or of pleasure; it presents more than anything else a temptation to misuse. Whether therefore the mischiefs to be guarded against, the temptations to be restrained, or the express words of the statute, are considered, it is equally apparent that treasurers of railroad corporations, as well as of other bodies politic, to whose care any kind of personal property is specifically entrusted by their employers to be kept for them, are to be accounted officers, within the meaning of that term as it is used in the particular section of the statute prescribing the punishment of embezzlement.

2. As we thus find that the defendant occupied a position in which he was capable of committing the offence charged against him in the indictment, we are brought to a consideration of the several rulings of the presiding judge which are complained of as erroneous.

In the first place the defendant insists that all the evidence concerning the confessions supposed to have been made by him to John B. Parker and to Samuel Hooper, which was produced by the government in support of the prosecution, ought, upon his objection thereto, to have been rejected, because they were not, in a legal sense, voluntary confessions, but were evoked from him by promises of favor, held out to induce him to acknowledge himself guilty of embezzling the money of his employers. If he was right in the fact which he thus alleged, there can be no doubt that the objection which he predicates upon it ought to have been allowed to prevail; for no legal proposition is better established than that upon which the objection rests. It is certainly a clear as well as familiar principle of law, that every free and voluntary confession is admissible in evidence against a party accused of any criminal offence; but that all those which are obtained from him by threats of harm, or promises of favor and worldly advantage, held out by a person in authority, or standing in any relation from which the law will

presume that his communications would be likely to exercise an influence over the mind of the accused, are to be excluded from the hearing of judicial tribunals. This is in conformity with the whole current of authorities on the subject. 1 Greenl. Ev. § 219. *Commonwealth* v. *Knapp*, 9 Pick. 507, and 10 Pick. 489. 2 Bennett & Heard's Lead. Crim. Cas. 184 *& seq.* Rosc. Crim. Ev. 29. Doubts have sometimes been expressed both as to the expediency of the rule, and the extent to which in particular instances it has been allowed to be carried; but no one thinks of breaking in upon or attempting to disturb it. *Regina* v. *Baldrey*, 5 Cox C. C. 523. " The ground," said the chief justice of this court, " on which confessions made by a party accused, under promises of favor, or threats of injury, are excluded as incompetent, is, not because any wrong is done to the accused, in using them, but because he may be induced, by the pressure of hope or fear, to admit facts unfavorable to him, without regard to their truth, in order to obtain the promised relief, or avoid the threatened danger, and therefore admissions so obtained have no just and legitimate tendency to prove the facts admitted." *Commonwealth* v. *Morey*, 1 Gray, 462, 463.

It does not appear from the bill of exceptions that any doubt whatever was entertained by the court, upon the trial of the defendant, concerning his right to have the full benefit, advantage and protection of this rule of law, or that any controversy arose or existed concerning it. But there was a question of fact which was debated by the parties; and this was, whether the communications of the defendant to Parker and to Hooper were free and voluntary disclosures, or were drawn out by promises of favor held forth to induce him to make an acknowledgment of his guilt. In relation to the testimony of Parker, it is distinctly stated in the bill of exceptions that the court determined that the facts disclosed by Reed were insufficient to exclude the proposed evidence of the defendant's confessions upon the ground that they were made under the influence or in consequence of any promises of favor. And although nothing is specially said upon this subject 'n relation to the testimony of Hooper, we think it is very ap-

parent that it was held to be admissible solely upon the ground
that there was no sufficient proof before the court of any such
antecedent promises as would justify its exclusion. Indeed, all
this is substantially conceded; for in the argument in support
of the exceptions it was not suggested that there was any fail-
ure on the part of the court to recognize this principle of law,
or any refusal to apply it in what was admitted to be a proper
case, but that it was erroneously determined upon the evidence
that no promises of favor were held out to induce the confes-
sions of guilt upon which the government relied in support of
the prosecution.

The question then recurs whether that adjudication was cor-
rect. This is to be determined upon a consideration of the evi-
dence which was before the court when that question arose, and
cannot be settled by a mere reference to judicial authorities.
These can only supply the principle of law which is to consti-
tute a uniform standard of decision; but in every case the ad-
missibility in evidence of confessions must depend upon the pe-
culiar state of facts and circumstances under which it is offered.

To show that the confessions of the defendant to which the
testimony of Parker relates were not free and voluntary com-
munications, but were educed from him under the pressure of
hopes excited by promises of favor, the defendant relied at the
trial, and still relies, upon the facts disclosed by Reed in his ex-
amination upon the preliminary question. It appears from this
examination that on the evening of the 27th of June 1855 the
defendant went, in company with his wife, and certainly after
consultation with her in relation to the objects of his visit, to
the residence of his friend Reed in Lynn, to make a disclosure
of the trouble in which he was involved, and to solicit advice
concerning it. After he had, in language the substance only of
which is stated, admitted that he was a defaulter in his official
capacity as the treasurer of the Eastern Railroad Company,
Reed said to him that " he had better go to the directors and
make a clean breast of it;" " that it would be for his in-
terest to go and confess all;" " to go and make a full confes-
sion;" that " he had better go and make a clean confession and

Commonwealth *v.* Tuckerman.

a clean breast of it." It is insisted that these expressions, to which it appears that Reed repeatedly gave utterance, were calculated to encourage the defendant to confess, to excite in his mind hopes of relief and advantage if he yielded to that advice; and that he must have considered them to be, and that they were in fact, promises of favor held out as inducements to influence him in the course of conduct he should pursue. Such might, and perhaps would, be the necessary and legal consequences of these exhortations of Reed, if they were to be considered without reference to the circumstances under which they were made, and to whatever else was said at the same time, tending to limit, explain and qualify their meaning. The accompanying circumstances are never to be lost sight of in determining whether proof of confessions alleged to have been made shall be received. Thus, if an accused party has been made a prisoner, anything which may be said to him by the officer by whom he is held in custody will always be scrutinized with the greatest care, and slight promises of favor coming from him will be considered a sufficient reason for rejecting all proof of subsequent confessions. *Commonwealth* v. *Taylor*, 5 Cush. 605. But the defendant was not under arrest, and no charge had been brought or complaint made against him at the time of his interview with Reed. From the responsible position which he occupied, as the treasurer of a great railroad corporation, it is impossible not to regard him as a person possessed of at least the ordinary degree of intelligence, and quite capable of appreciating the force and effect of the whole conversation which then took place. And in looking at the bill of exceptions, it is very plain that, in addition to the expressions which have already been quoted, much was said by Reed by which they were materially qualified. Thus he states that he " said nothing, in terms, of a prosecution;" that he told the defendant " to commit no violence on himself, nor run away; that the disgrace was in doing wrong, not in suffering punishment for it; he had better stay and meet the punishment;" and finally, that he " advised the defendant as a friend and as a son." Now it is impossible, taking all this together, to consider that any prom-

ise of favor was held out to the defendant as an inducement to confess his guilt. But there, was a consultation between the parties; and the defendant, at the conclusion of their conversation, obtained all that he went to solicit from his friend. It was advice how he should conduct himself in the emergency into which he had fallen, that he particularly sought for; and that advice was given generally, upon the broad ground of right and expediency; and though pressed with an earnestness corresponding with the importance of the occasion, Reed did not presume to accompany it with any assurance of protection or any promise of favor or relief. And it was obviously understood in this light by the defendant; for at that time he declined to reply in any detail to the inquiries which were urgently, though kindly, pressed upon him; and he reserved to a future occasion the determination whether he would make the frank and full communications to which he was exhorted. This was all the evidence, when the testimony of Parker was offered, which was before the court to show that any promise of favor had been made or held out to the defendant; and as it fails to prove that fact, it was rightly held that there was no sufficient ground upon which it could be excluded.

Nor does it appear from the testimony of Hooper that, previously to making those confessions to him, which the government proposed to put in evidence, any promises of favor or assurances of safety or relief had been held out to the defendant to bias or disturb his judgment, or to influence his conduct or course of action. When they met in the morning after the interview with Reed at the office of the latter, Reed urged the defendant to make a full confession; tried very hard to make him do so; and amongst other things said that Hooper had influence with the directors, and would see that he was not complained of or arrested. But here Hooper interposed, and told Reed to stop, and declared that he would make no promises whatever. And although he afterwards said to the defendant, that he had no vindictive feelings towards him, and intended to do whatever was right and proper for him to do to prevent his arrest or the institution of a prosecution against him; yet he cautiously and repeat-

edly added, that he did not know the extent either of his power or of his duty ; but that at all events he would enter into no stipulations with or make any promises to the defendant, who, in revealing or fully developing the particulars of his defalcations, must confide wholly in him ; and that he should in every respect, without embarrassing himself by any previous engage·ments, do precisely as his own judgment and discretion should direct him. This is too clear and explicit to admit of any doubt, either as to what was said, or as to the import and meaning of what was said. Not only were no promises of favor made; but the defendant was repeatedly warned, in substance, that none would or could be made, and that he must decide for himself whether he would disclose or withhold the information he was desired to communicate. He afterwards did confess, and gave to Hooper for the directors a detailed written statement of the various sums of money which he had on different occasions abstracted from the company's treasury ; not, as there is any reason to suppose, under the influence of a promise of favor which had, or which he supposed had, been made to him; but rather in a confidence entertained in his own mind, and probably well founded, that what he might do in future would mitigate the resentment or disapprobation of those whom he had injured, and thus secure to himself protection and relief. The judge determined, and we do not see how he could have come to any other determination, that evidence of the confessions which ensued was admissible.

3. The defendant further excepted, and now objects, to the ruling of the presiding judge, that, if money which belonged to the Eastern Railroad Company was deposited in the Merchants' Bank by the defendant to his own credit as treasurer of the corporation, and he afterwards in that capacity drew his own check upon the bank therefor, and received the amount of it in bills, those bills, while in his hands as treasurer, were the property of the corporation, and might be embezzled by him. And this objection is attempted to be supported upon two grounds : first, that the defendant, though bound by law to apply that amount of money to the use and service of the corporation, was not

required absolutely to apply those identical bills for that purpose; and secondly, that the relationship between him and the corporation was such that his possession gave them no ownership of the money or coin which he drew from the bank. As to the first of these reasons, it may be assumed as true that, if unrestrained, as in this instance he appears to have been, by positive instructions on the subject, the treasurer might lawfully change the money which came into his hands, whenever and as often as he should choose to do so; but the consequence contended for by no means follows from the exercise of that right or privilege. The change of one parcel of bank bills for another parcel, or for their equivalent value in any species of currency, can have no effect upon the rights of the parties in relation to the question of ownership; for of whatever the money, which for the time being is in the hands of the treasurer of a railroad company and held by him on their account, may consist, it always, and in every shape, belongs to his principals. He is at all times the keeper of their property, and never, whatever its form may be, can rightfully set up any claim of ownership to it in himself, in opposition to them. He cannot cease to hold it in trust, so long as he holds it at all. Here it is admitted, in the very terms in which the exception is stated, that the money which was deposited in the bank belonged to the corporation. They had therefore a perfect right to draw and use the amount deposited as their own; and it could be drawn only upon the order or check of their treasurer. When it was so drawn, the bills received could no less be theirs, than were the bills or coin placed on deposit, and for which by this course of proceeding they would have been virtually exchanged. And this shows that there is no foundation for the second reason urged in support of the exception. The relationship of the parties to each other is not that of debtor and creditor; nor does it arise from a contract that one of them shall collect and receive money belonging to the other, and thereupon account for and pay it over to him; or that one shall pay over to the other the proceeds of property which he has been authorized and employed to sell for the owner; as in the cases of *Commonwealth* v. *Stearns*, 2 Met. 343, and *Com-*

*monwealth* v. *Libbey*, 11 Met. 64, cited by the counsel for the defendant. But, more than this, he is exercising a trust which is not only faithfully, but specifically, to be observed and kept. As an officer of the corporation, whose especial duty it is to hold, manage and control their funds, whenever money belonging to his principals comes into his possession, he must hold it in his fiduciary character, having no further right to or interest in it than that which is sufficient to enable him to discharge his duty to the owner by whom he has been intrusted with its possession. The ruling of the court upon this subject appears therefore to have been perfectly correct.

4. The next exception of the defendant is founded upon the general and well established rule that in all trials, and especially in every criminal trial, the evidence must be confined to the proof or disproof of the precise point in issue. And it is undoubtedly true that the prosecutor is commonly to be restrained from proving the commission by the accused of other distinct offences, for the purpose of showing that he is guilty of that which is specially charged against him. The defendant objects that this rule, which was of the greatest practical importance to him, was directly disregarded upon his trial; and that if it had been properly enforced, all the evidence which was admitted respecting acts of alleged embezzlement of property belonging to the Eastern Railroad Company, other and distinct from those set forth and charged against him in the indictment, would have been excluded.

To form a correct opinion upon the question whether this evidence was admissible, it is necessary to take notice, in the first place, that it was confined to a special and designated class of facts, having, as it was alleged, and as it was understood by the court, a peculiar and intimate, if not also an inseparable, connection with, and tending to explain and characterize, the material act in issue which was charged against the defendant; and secondly, that it was allowed to be laid before the jury for the sole purpose of showing that the money alleged to have been embezzled was taken and appropriated by him with a fraudulent intent. The counsel for the government proposed to enter upon

17 *

a much broader field of inquiry, and to prove, without limitation, the commission of distinct and independent acts of embezzlement during the period between six months and four years next preceding the commission of the act charged in the indictment. But he was not allowed to do so. In the strict application of the rule, that no evidence inapplicable to the precise point in issue is admissible, all the proofs which he offered in relation to those remote and independent facts were rejected. But there was another class of facts of an entirely different character. It had already appeared in the progress of the trial, from the testimony of Hooper, that the defendant, in giving an account of his dealing with the funds of the corporation, produced and delivered to him a detailed statement in writing of the various sums of money which he had, after receiving them in his official capacity, wrongfully abstracted from the treasury, and for which he was then a defaulter. This paper had been produced in evidence. One of the items found upon it was the same sum of $5000, the embezzlement of which was set forth and charged against the defendant in the indictment. This item and all the items contained in the paper were explained by him to Hooper to be a statement of the different amounts of the property of the corporation which he had appropriated to his own use. All these various circumstances appeared to the court below to have a tendency to prove that the misappropriation of this sum of $5000 was one of a series of connected transactions, and that the whole series would tend to show the intent of the defendant in doing the particular act which is made the subject of accusation against him in the indictment. There may be a difference of opinion as to the effect of this evidence, of the inferences to be drawn from it, and of its sufficiency to prove the occurrence of a series of connected transactions, and the guilty intent of the defendant in them all, which it was the object of the government to establish by its introduction. But it is enough that it had a tendency to show these important facts. The intent and purpose of the defendant, in the withdrawal of the sum of $5000 from the treasury of the corporation, and in the disposal and appropriation which he made of it, was an essential matter

of inquiry in relation to the issue to be tried. His alleged guilt consisted not merely in the conversion of the money, but in its fraudulent conversion to his own use. Hence it was competent for the government to introduce evidence of any facts tending directly to show his fraudulent intent, or from which that intent might justly and reasonably be inferred. It was in this view, that the government was permitted to lay before the jury proof of the embezzlement by the defendant of the several sums of money mentioned in the written statement which constituted a part of his confessions to Hooper. In relation to each and all of these several sums of money, if his conduct, motive, purpose and intent ought not to be considered to be by him confessedly of the same character, yet it is clear from the testimony of Hooper that, in the full explanations afforded in the course of his confession, the defendant himself did not indicate or suggest any distinction between them, but brought them all together in one general statement of his defalcations. If his intent in relation to all of them was precisely the same, then if in reference to any of them it was shown to be fraudulent, all would be shown to be fraudulent, and thus a particular fact material to the issue would be satisfactorily established. Considered in this aspect, it will be seen that the admission and exclusion of all the evidence, produced or offered by the government concerning transactions other than those mentioned in the indictment, were both regulated, not in disregard, but in strict recognition, of the rule requiring it to be confined to the proof or disproof of the point in issue. Thus all the proof which was offered in relation to transactions not intimately and directly connected with the particular accusation against the defendant, or with the evidence, or in necessary explanation of the evidence, adduced to establish it, was carefully rejected. But, on the other hand, transactions which had that intimate connection were permitted to be shown, because they tended to develop and expose the fraudulent intent of the defendant in converting to his own use the $5000 which he is charged in the indictment with having embezzled, and thus to sustain one of its essential allegations. This was perfectly right. Where the intent of the accused party forms any part

of the matter in issue, evidence may always be given of other acts not in issue, provided they tend to establish the intent imputed to him in committing the act. Rosc. Crim. Ev. 71. The same proposition is stated, though in somewhat different language, by Archbold. Archb. Crim. Pl. (10th ed.) 112. This rule is always recognized. It is uniformly acted upon in criminal trials, whenever an occasion arises for its application.

Thus where a party was tried upon an indictment for the crime of adultery, evidence of three instances of improper familiarity between the prisoner and his supposed paramour, one of which occurred within a fortnight and the others within a year next preceding the particular act complained of, was held to be admissible; and this manifestly for the purpose of showing the intent of the parties when they met in secret, so that no direct evidence of their conduct there could be expected to be produced. And in delivering the opinion of the court, it was said by Putnam, J.: " Evidence should be excluded which tends only to the proof of collateral facts. But it should be admitted if it has a natural tendency to establish the fact in controversy." To which he immediately adds : " It was argued that the defendant was not to be put upon his trial for every act of his life, but for a particular offence. Be it so ; if the evidence which was received has a natural tendency to corroborate other direct evidence in the case, it would seem to be clearly admissible." *Commonwealth* v. *Merriam*, 14 Pick. 519, 520.

In the case of *Commonwealth* v. *Eastman*, 1 Cush. 216, this principle of law was not only fully recognized, but its decision afforded an opportunity for a clear exposition of the occasions upon which it may be availed of, and of the reason upon which it is founded. The defendants were indicted for obtaining goods and merchandise, by false pretences, of certain persons named in the indictment. On the trial evidence of purchases of goods from other persons, under circumstances similar to the transactions charged in the indictment, was offered in support of the prosecution. It was objected to, but admitted. In stating the opinion of the court, after an elaborate argument by the counsel for the defendants, it was said by Dewey, J.: ' This species

of evidence would not be admissible for the purpose of showing that the defendants had also committed other like offences; but simply as an indication of their intention in making the purchases set out in the indictment." " Such evidence is always open to the objection that it requires the defendant to explain other transactions than those charged in the indictment; but when offered for the limited purpose of showing a criminal intent in doing the act charged in the indictment, it has always been held admissible." See also *Commonwealth* v. *Miller*, 3 Cush. 250.

These authorities abundantly establish the principle contended for on the part of the government. It is not indeed denied by the counsel for the defendant; but the objection urged to the admission of evidence concerning other acts of embezzlement beyond that immediately charged in the indictment rests wholly upon the rule that it ought always to be confined to the precise point in issue. But in the position of the case, when during the progress of the trial evidence of some such transactions was offered, the government had become entitled, not in disregard or in violation of that rule, but upon another distinct principle, to avail itself, to the extent which was authorized by the court, of proof concerning those particular transactions which the defendant by the manner and form and peculiarity of his confessions to Hooper had made pertinent, if not indeed indispensable, to a true exposition of his intent in using the particular sum of money alleged in the indictment to have been embezzled. The evidence was therefore properly admitted.

5. In reference to the general crime of embezzlement, the jury were instructed, that if the defendant, acting as treasurer, took the money of the corporation which had been entrusted to him, and used it for his own purposes, knowing that he had no right to do so, and did it without the consent of the company or of any of its officers, and concealed the transaction from them, this amounted to a fraudulent conversion of the money of the company, even though at the time of taking it he intended to restore what he had so appropriated, before the appropriation should become known to its owners, and believed that he should be

able to do so, and had in his possession property to secure the full amount of the property so taken. This instruction is objected to by the defendant for the assigned reason that it amounts to a statement, that every conversion made without a formal claim of right is a fraud; and that from any and every conversion fraud is necessarily to be presumed; and that therefore the question whether the defendant was actuated by a fraudulent intent was substantially and improperly withdrawn from the consideration of the jury.

Embezzlement of property by officers, clerks, agents and servants is fully defined by the statute, which creates the offence and provides for its punishment. A fraudulent intent is made a constituent and an essential part of the offence. Without it there may be misconduct, but there will be no criminality. The question therefore whether any particular act of conversion was infected or accompanied by a fraudulent purpose is a question of fact to be passed upon by the jury. But the submission of that question to their determination ought to be accompanied with suitable instructions in the matters of law which pertain to it. This being done, it may be sufficient to leave them to find whether there was or was not any fraudulent intent, in the legal sense and meaning of that phrase, and according to the definition of it which may have been given to them; or whether they are reasonably satisfied of the truth of certain enumerated facts and circumstances from which a fraudulent intent, is a direct and inevitable inference. It is very plain that the latter was the course pursued upon the trial in the present case. For although in one part of his charge the presiding judge stated most explicitly that to establish the charge against the defendant the government must make out a fraudulent taking and conversion, and explained satisfactorily the nature of fraud and in what it consists, yet in conclusion the jury were advised that the actual conversion by the defendant to his own use of money belonging to his employers, which they had entrusted to him in his official capacity, doing this without their consent, and knowing that he had no right to do it, and concealing it from them, would amount to a fraudulent conversion. The question therefore, plainly

stated, is, whether from the facts and circumstances to which the attention of the jury was thus called and directed a fraudulent intent in the taking and conversion of the money is the only just and reasonable inference which can be deduced.   In fraud there is always some kind of deception.   And a fraud may be defined to be any artifice whereby he who practises it gains, or attempts to gain, some undue advantage to himself, or to work some wrong or do some injury to another, by means of a representation which he knows to be false, or of an act which he knows to be against right or in violation of some positive duty.   All these elements and characteristics of fraud are embraced in the hypothesis which was put to the jury, and upon which the final instructions given to them, and now objected to, were founded.   The appropriation to his own use by the defendant of money belonging to the corporation, which came into his possession by virtue of his office and employment, and was thus entrusted to his care, was an unlawful act.   It was a breach of trust; and, upon the supposition that he well understood that he had no right so to dispose of it, was a wilful violation of his duty.   He unjustly gained thereby an undue advantage to himself in the accomplishment of objects purely selfish and personal, by applying to his own individual purposes the property of others, which he ought faithfully to have kept and preserved exclusively for them.   He committed a wrong against his employers by secretly substituting his own mere personal credit and liability in the place of the specific property which they had entrusted to his care, and thus subjected them to a risk and hazard of loss which they had never consented or intended to assume.   And by concealing the transaction from their knowledge, he practised upon them a preconceived and intentional deceit.   For concealment, in the connection in which it was spoken of by the court, necessarily imports the execution of some plan previously arranged, or of some design which had been cautiously premeditated.   This is not merely that he was still and silent, or omitted to publish or disclose what he had done; but involves by necessary implication the idea, that he had deliberately resorted to the active employment of means,

which he believed would be effectual for that purpose, to secrete and hide from his employers the fact of his defalcation, in order that he might escape with impunity from its consequences. How, or in what manner, he effected that concealment, or whether any evidence was adduced upon the trial, which would warrant the conclusion that it was in fact in any way effected it is not now material to consider or inquire. It might have been by false entries upon the books of the corporation, or by the failure to make any entry upon them at all; or by representations known to be untrue; or by any device resorted to for the purpose of disguising the truth from the knowledge of his employers, and thus inducing them to rest in a false security. All these were proper subjects of inquiry and investigation upon the trial before the jury. We are confined here to the question whether the rule of law which was laid down for a guide to them in their deliberations was correct. And in this point of view it is obvious that the actual use of means in conformity to some scheme devised to conceal the unlawful appropriation of their money from his employers directly imports and evinces a purpose to mislead and deceive them. But no single circumstance is alone to be taken into consideration. The several acts enumerated as parts of the hypothesis upon which the instructions to the jury were predicated, embracing the conversion by the defendant of the money of his employers, the known violation of duty thereby, the evident advantage gained for himself, the injury inflicted upon his employers, and some of these objects accomplished by artifice and deception voluntarily practised, were respectively unlawful; and taken altogether as one general fact, though consisting of several, but a connected series of, transactions, they constitute an act of positive fraud. And he by whom these acts were done must be presumed to have contemplated and intended the natural and probable consequences of his own well understood misconduct. And since the intention by which a party is actuated in any particular transaction must be presumed to participate in the nature of that transaction and of the various acts by which it is consummated, the inference must be inevitable that

the perpetrator of a fraud commits it with a fraudulent intent. This result shows that the law was rightly stated and explained in the instructions to which exception is taken. These instruc- . tions were predicated upon the facts embraced in the hypothesis laid before the jury; and as the doing of the acts therein mentioned was fraudulent, the motive and intent with which they were done were fraudulent also.

This result cannot be affected by the consideration, if it be admitted to be well founded, that the defendant, at the time of taking and converting the money to his own use, intended to restore it to the owners before his appropriation of it should become known to them, and believed that he should be able to do so, and had in his possession property to the full amount of the money which was taken. The intention to take, and the intention at some future time to make restitution, may be two different operations of the mind, just as the taking of money at one time and the repayment of it at some subsequent period are two distinct transactions. But even if it can be supposed that these two purposes, having in view the accomplishment of objects entirely distinct from each other, may be so blended together, by being contemplated at one and the same moment, as to be absolutely inseparable, still it is undeniable that the execution of them can be worked out only by successive acts, with some intervening space of time between them. The abstraction must necessarily precede the restitution. The first will be complete before there is a possibility of commencing the act by which it is to be followed. And thus, whatever it may be the purpose of a guilty party ultimately to do, the offence prohibited by the statute will already have been consummated whenever, after the commission of all the other acts of which it consists, a fraudulent conversion of property shall have actually taken place. And even if it be necessary to go the length of affirming that there can be no embezzlement except where money or property is taken with an intention never to return to the owner that which is taken, the actual use and conversion of money will cover and comprehend that proposition. For as an entrusted agent, servant or officer can convert to his own use the

money of his employer only by passing it out of his hands and delivering it with the right of property to some other person, since, so long as he remains in possession of it, it will continue to be the specific property of his principal, he necessarily loses all control of it by such an unlawful conversion, and can never afterwards by his own mere power and motion bring it back. The past is complete and unchangeable; and as to the future he is dependent upon the will of others and upon circumstances over which he cannot exercise an absolute control. The intention to abstract the money and appropriate it to his own use has been fully executed; the intention to indemnify and do justice to the party from whom it has been withdrawn remains unexecuted, and may finally, however conscientiously entertained, be altogether defeated. Conversion bears nearly, if not quite, the same relation to embezzlement, as asportation does to the crime of larceny. Yet no one would doubt but that the commission of the latter crime would be fully consummated if a person, possessed of abundant means to afford and ultimately to insure a complete indemnity to the owner of stolen property, if applied to that purpose, should, under the pressure of some present necessity for money, go furtively into his neighbor's shop, and carry away from there a parcel of coin or bank bills found there, although the act were accompanied with an intention to return as much at an early, but yet at a future, day, to be put in its place before the money should have been missed or the trespass become known. That which must always qualify and characterize the act is the intention of the party when he takes or converts to his own use the property of another person. If the intention be to use and enjoy the thing taken for some brief period, and then to abandon or restore it to the owner in the identical form and condition in which it was taken, a trespass only may have been committed, however unjustifiable were the means by which the possession of it was acquired; but if the intention be, feloniously in the one case, or fraudulently in the other, to make a full and entire appropriation to his own use, and thus absolutely to deprive the owner of his property, the act, whether of asportation or of conversion, will be criminal,

and is not to be excused or justified by any resolve, however honestly entertained, to make restitution at some future, but indefinite period.

It was in conformity to the principle, thus developed, that the instructions to the jury which are complained of were framed and accurately stated. They were to find the conversion of the money taken by the defendant from the treasury of the Eastern Railroad Corporation to have been fraudulent, if they found the evidence laid before them sufficient to prove the truth of certain alleged facts from which a fraudulent intent was a legitimate and an inevitable inference. Thus under these instructions it must have been made satisfactorily to appear to the jury, before they could have rendered a verdict of conviction, that the defendant, standing in a relation of trust and confidence to his employers, not only unlawfully and in violation of his duty converted their money, entrusted to his official care, to his own use; but that he did it by artifice and deception deliberately practised, and therefore with a fraudulent intent. These instructions then contained a precise description of one of the acts of embezzlement, which are made criminal by the express provisions of the statute; and they were accurately adapted to the particular accusation set forth in the indictment against the defendant.

6. In addition to the various objections which have now been considered and disposed of, the defendant excepts to the course of proceeding upon the trial, and to the refusal of the presiding judge to rule in conformity to many of the prayers for instruction, which were seasonably presented to the court for its adoption. Instead of adopting them, he gave such instructions as he deemed proper for the direction and guidance of the jury. When, as in the present case, at the close of a protracted trial, many prayers for instruction, voluminous and complicated in their structure, are presented to the court by either or both of the parties, it is within the judicial discretion of the judge to respond to them severally, adopting such parts as appear to be correct, and rejecting the residue altogether; or to explain the law wholly in language of his own. And no cause of complaint is thereby afforded, if all the matters propounded in the various

prayers are fully adverted to and explained. No complaint of any omission in relation to them is urged by the defendant; but he insists that the court erred in overruling the doctrine, which he says is involved in his prayers for his instructions, that there can be no embezzlement unless there has been a demand of the money alleged to have been embezzled, or a denial of its receipt, or some false account given of it, or a false statement or false entry concerning it, or a refusal to account for it. If the doctrine so stated be fairly indicated and involved in those prayers, it is clear that they were properly overruled, because it is apparent, from the definition already given, that the several circumstances above mentioned do not in fact constitute any part or element of the offence. They are facts and circumstances admissible in evidence as bearing upon the question of a fraudulent intent; but for all other purposes they are wholly immaterial. And this is all that is shown by the several authorities cited by the defendant to support the doctrine supposed to be asserted in his prayers for instruction. Thus it appears in relation to these prayers that both the refusal of the court to adopt them literally as the basis of its instructions, and the substitution of a different definition of the offence charged against the defendant in the indictment, were correct in point of law and obnoxious to no valid objection.

*Exceptions overruled.*