### PEOPLE v. MONTGOMERY.

(Supreme Court, Appellate Division, First Department. July 11, 1912.)

1. EMBEZZLEMENT (§ 44*)—FRAUDULENT INTENT—EVIDENCE—SUFFICIENCY.

In a trial for larceny of funds of a bank of which accused was an officer, evidence *held* to warrant a finding that the funds were misappropriated with fraudulent intent.

[Ed. Note.—For other cases, see Embezzlement, Cent. Dig. §§ 67–70; Dec. Dig. § 44.*]

2. EMBEZZLEMENT (§§ 4, 39*)—ELEMENTS.

That no demand was made on accused to restore money misappropriated by him as an officer of a bank, that he did not deny receipt of the funds, gave no false account or statement concerning them, and caused no false entry to be made in the bank's books does not show lack of any element of the offense of larceny, though such facts were admissible as bearing on the question of fraudulent intent.

[Ed. Note.—For other cases, see Embezzlement, Cent. Dig. §§ 1, 62; Dec. Dig. §§ 4, 39.*]

Appeal from Court of General Sessions, New York County.

William R. Montgomery was convicted of grand larceny in the first degree, and he appeals. Affirmed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, SCOTT, MILLER, and DOWLING, JJ.

James W. Osborne, of New York City, for appellant.
Robert S. Johnstone, of New York City, for the People.

SCOTT, J. [1] The appellant was charged by an indictment comprising three counts with the larceny of the sum of $4,400 property

of the Hamilton Bank, of which he was at the time the president. The case was sent to the jury upon only one count, that charging the offense formerly known as embezzlement, now known as larceny; the substance of the count being that said appellant, being an officer of the bank having in his possession, custody, and control funds of the bank, feloniously appropriated the same to his own use with intent to deprive and defraud the corporation thereof, and of the use and benefit thereof, and the same did then and there feloniously steal.

On October 23, 1907, the Hamilton Bank, of which the appellant had long been vice president and for a short time president, was in such financial straights that it was about to close its doors, as the appellant well knew. In fact, it did close on the next day. At a late hour in the afternoon plaintiff obtained through the agency of a man named Gross from the Tremont Branch of the bank the sum of $4,400. This sum was paid out by the manager of the branch, after banking hours, and after a telephone conversation with appellant, upon the presentation and discount of a note signed by one George Cromer and indorsed by the Minford Realty Company, which note had been given by appellant to Gross, with instructions to have it discounted at the aforesaid branch bank. That the money was thus obtained, and that it was paid over by Gross to appellant, and received by the latter on the evening of the same day, is not denied. The evidence was such that the jury were amply justified in finding that the appellant caused the money to be withdrawn from the bank, and took possession of it with the purpose and intent of appropriating it to his own uses, and that he did in fact so appropriate it. Indeed, it was specifically conceded upon the trial by his counsel (the defendant himself did not testify) that the appellant "got the money, personally, for his own use." The defense mainly relied upon was that the defendant in so taking the money was guilty of no felonious intent because the bank was amply protected, or he believed in good faith that it was amply protected, by a mortgage of the Minford Realty Company upon certain real estate of which appellant had once been a part owner. The real estate consisted of a number of lots at Unionport on the Westchester creek. Appellant and a man named Knauf had purchased the property in the year 1906 for $21,250, of which $15,250 remained on mortgage; the appellant contributing in cash $1,500 and Knauf $4,500. Title was taken in the name of Knauf's wife. In August, 1906, through appellant's efforts, the property was sold to a man named Sill, at the price of $31,250, which was paid as follows: The $15,250 above mentioned remained, and Sill executed two mortgages for $7,875, each one of which was given to Mrs. Knauf, and the other to a gentleman who acted as attorney for appellant. Sill also gave appellant his note for $250. Both of these mortgages for $7,875 each were afterwards assigned to the bank, but it was shown and conceded upon the trial that they formed no part of the security for the note upon which appellant received the $4,400 he is accused of embezzling. Thus the mortgages, ahead of any security for the $4,400 note, aggregated $31,000. Later, at the suggestion of appellant, Sill organized the Minford Realty

Company, and conveyed the Unionport lots to it, subject to the aforesaid mortgages. Some time before the failure of the bank, appellant informed Sill that he wished to raise $15,000 to $18,000 to enable him to buy stock enough to control the bank, and asked for Sill's assistance. He requested Sill to cause the Minford Realty Company to execute a mortgage for $20,000 to be given to the bank. This would make the total incumbrance upon the property $51,000. Sill apparently protested that this was more than the property was worth, but appellant said he would carry it through all right. Sill also, at appellant's request, gave him a number of blank notes and checks made by the Realty Company. It appeared from the books of the bank that notes of the Realty Company aggregating $13,525 had been discounted by the bank before the discount of the note upon which appellant received the $4,400, and were then held by the bank. What became of the proceeds of these notes does not appear, except that neither Sill nor the Realty Company seems to have received any of it. The mortgage for $20,000 was made on August 16, 1907, and transferred to the bank on August 17, 1907; the discounts of the Realty Company's notes being made soon afterwards. The two notes for $7,875 each were transferred to the bank in October and November, 1906. At about that time the manager of the Tremont Branch entered upon the books, at appellant's direction, a memorandum that the property mortgaged was of the value of $40,000 subject to a prior mortgage of $15,000. Soon after the $20,000 mortgage was assigned to the bank, the same manager, at appellant's direction, made an entry to the effect that the property mortgaged was worth $75,000, subject to prior mortgages aggregating $31,000. What the real value of the property was is problematical. Expert witnesses were called by both the prosecution and the defense, and, as usual, differed widely in their estimate, the most optimistic placing the value only slightly higher than the mortgages placed upon it. Others estimated at a much lower figure.

Thus it appears that on October 23, 1907, when the bank of which he was president stood on the verge of imminent failure, he took from its funds the sum of $4,400 for his own purposes, not upon his own credit, but upon the note of the Minford Realty Company, secured by a mortgage of $20,000 on property already incumbered to the extent of nearly $45,000, which he had bought in 1906 for $21,250, and which he had valued on the books of the bank in October and November, 1906, at only $40,000. At the best, the jury could scarcely have found that defendant could have entertained more than a hope that the security would ultimately prove sufficient to reimburse the bank. As was said by the Court of Appeals in People v. Meadows, 199 N. Y. 1–7, 92 N. E. 128, 130:

"A deliberate diversion of the moneys being shown, it required but slight evidence to satisfy the jurors as to the existence of the felonious or criminal intent. His expectation or intention of restoring the moneys so diverted of course was of no avail."

In point of fact there is no evidence that appellant ever entertained the intention of himself repaying the bank. His sole reliance

was that it would be paid out of the proceeds of property belonging to some one else.

[2] The defendant insists that he was not guilty of embezzlement because no demand was made of him to restore the moneys, and because he made no denial of its receipt, gave no false account or statement concerning it, and caused no false entry relating to it to be put in the books. All those circumstances, when they are shown to exist, do not in fact constitute any component part or element of the offense. They are merely facts and circumstances admissible in evidence as bearing upon the question of a fraudulent intent (Commonwealth v. Tuckerman, 10 Gray [Mass.] 173), but they are by no means the only competent evidence of such an intent. Other grounds are advanced why the result of the trial should be set aside, but they seem to require no extended comment. The appellant was treated with all proper consideration by the court, and, if errors in the admission or rejection of evidence are to be discovered in the record, they were invariably favorable rather than prejudicial to the appellant. The only serious question in the case was whether or not the appellant when he took the money of the bank for his own purposes did so with a felonious intent. That was purely a question of fact for the determination of the jury, and was fairly submitted to them. Upon the uncontradicted evidence, an intelligent jury could scarcely have arrived at a different result from that at which the jury did arrive.

The judgment and order are affirmed. All concur.