COMMONWEALTH *vs.* MELISSA S. CAPARELLA.

No. 06-P-782.

Middlesex. March 15, 2007. - October 16, 2007.

Present: LENK, GREEN, & SIKORA, JJ.

*Larceny. Embezzlement. False Entry in Corporate Record. Practice, Criminal,* Restitution. *Evidence,* Hearsay, Testimonial statement, Joint venturer.

Evidence at the trial of an indictment charging larceny by embezzlement was sufficient to convict the defendant, where, by virtue of her position of trust as a bookkeeper for a nonprofit corporation, she drafted and endorsed checks for personal use from the corporation's account, which derived its funds from a telemarketing program conducted in the name of the corporation — although that program was forbidden by the corporation — with the intent to permanently deprive the corporation of the funds. [509-514]
At a criminal trial, the admission in evidence of two sets of statements of a coventurer was proper, where the statements in the first set, made to high-level employees of a nonprofit corporation that the coventurer served as a manager, were not offered by the Commonwealth for their truth and in any event did not address specific conduct of the defendant [514-515]; and where the statements in the second set, made to three other employees of the corporation after the discovery of an unauthorized account created by the coventurer, were likewise not offered for their truth [515] and, even if treated as hearsay, qualified as an admissible exception, as evidence of concealment furthering the criminal enterprise [515]; moreover, the second set of statements did not create a substantial risk of a miscarriage of justice, as it did not materially influence the verdict [515-517].
The judge at a trial of an indictment charging larceny by embezzlement rationally and lawfully ordered restitution of the relevant funds through the period of the defendant's probation. [517-518]

INDICTMENTS found and returned in the Superior Court Department on March 29, 2001.

The cases were tried before *Charles M. Grabau,* J.

*Robert E. Fox* for the defendant.

*Steven W. Phillips,* Assistant District Attorney, for the Commonwealth.

SIKORA, J. At the conclusion of a seven-day trial, a Superior

Court jury convicted the defendant, Melissa S. Caparella, of the offense of larceny of property of value greater than $250 from the Massachusetts Special Olympics corporation (MSO) in violation of G. L. c. 266, § 30; and of the offense of making false entries in MSO's financial records with intent to defraud in violation of G. L. c. 266, § 67. Upon the conviction of larceny the trial judge sentenced the defendant to a term of two and one-half years in the house of correction. Upon the conviction of false book entries he imposed a term of ten years' probation from and after her incarceration. A condition of that probation was her duty (jointly and severally with a coventurer) to make restitution of $200,000 to MSO during that period. The defendant appeals on the grounds that (1) the evidence of larceny was insufficient as matter of law; (2) the trial judge wrongly admitted inculpatory statements of the coventurer; and (3) the judge incorrectly imposed the duty of restitution.

*Facts.* In the light most favorable to the Commonwealth, the evidence supported the following findings. MSO was an independent not-for-profit corporation. Contributions from the general public furnished its primary funds. An international parent organization, Special Olympics Incorporated, provided its charter. The purpose of the international organization and its chartered affiliates has been the provision of year-round sports training and competition for both children and adults with intellectual disabilities.

In Massachusetts, MSO divided its operations into fourteen local areas. In each area it employed a full-time or part-time manager. The responsibility of the area manager was to organize a volunteer team and to allocate to team members the tasks of recruitment, training, technology, competition, and fund raising. In 1998, MSO organized the fourteen areas into three sections. A layer of section management arose over the area managers.

Throughout the 1990's the defendant's father, Gerald Tenglund, served as the MSO manager for the greater Framingham area, originally designated as the South Central area and later as the Metro-West area. In 1991, Tenglund submitted a plan to MSO officers for a telemarketing fundraising program. Robert Johnson, then president of MSO, approved the program. It operated between October, 1991, and March, 1992. In April of 1992,

Johnson told Tenglund of concerns about the apparent cost of telemarketing (reflected in the area bank account) and about the use of runners, rather than mail, for collection of contributions. Johnson told Tenglund that the telemarketing should stop. Tenglund then informed Johnson that telemarketing had ceased.

In 1992 or 1993, the defendant began part-time work for MSO. At first she assisted Tenglund with record-keeping and miscellaneous work. In or about 1995, she began full-time duties as the bookkeeper for the Metro-West area managed by her father. She began to receive a periodic stipend for those services. With the introduction of section management in 1998, she added the function of bookkeeping for the entire section as well as for the constituent Metro-West area. For that increased responsibility she received a second periodic stipend.

Before the creation of the sections in 1998, each area maintained a single authorized checking account. Tenglund had authority to write checks on that account. With the establishment of the sections in 1998, MSO closed the area accounts and consolidated them at the higher section management level. From that time onward, Tenglund lacked authority to draft checks on the section account. The defendant, as section bookkeeper, acquired that authority.

In May of 1999, MSO management learned of a checking account maintained at Fleet Bank (formerly Shawmut Bank) in the name of MSO and under its federal identification number. Tenglund and the defendant had opened the account in April of 1993 by documents designating the defendant as the corporate secretary of "MSO South Central." She did not hold such a position or title. Tenglund and the defendant wrote checks from the account. She managed it. MSO policy did not authorize the account.

The account derived its funds from a telemarketing program conducted in the name of MSO by persons employed by Tenglund. The callers requested donations to MSO. Donors made checks payable to MSO or to "Special Olympics." A runner retrieved the checks for Tenglund or the defendant. The person collecting the checks was a volunteer; he believed that the donations were proceeding properly to MSO.

Deposits to the telemarketing account greatly exceeded the

revenues reported to MSO. From July, 1995, through December, 1998, the deposits totaled $567,184.91. For that same period the area reported to MSO revenues of only $72,695.48. For that period checks and withdrawals from the account amounted to $571,185.41. However, the area reported to MSO expenditures of only $101,069.03.

During this period the defendant made payments from the account to the individuals performing telephone solicitation. The evidence does not indicate their awareness of the ultimate diversion of donations generated by their calls. The defendant wrote checks from the account to cash in the aggregate of $87,882. Of that amount she endorsed checks totaling $76,987; Tenglund endorsed checks in the sum of $8,562. The defendant drafted checks to Tenglund in the amount of $16,031. Both Tenglund and the defendant had automated teller machine (ATM) cards for the unauthorized account. From July, 1995, through December, 1998, ATM debit cards accounted for withdrawal of $97,649 from the account. The defendant drafted checks from the account to pay expenses of Tenglund, including healthcare bills, rent, and automobile payments.

During the period of 1993 to 1995, approximately $22,000 passed from the unauthorized account to a proper MSO account. No such transfers occurred after the close of 1995.

*Discussion.* 1. *Sufficiency of the evidence of larceny.* At trial the Commonwealth pursued a theory of larceny by embezzlement in violation of G. L. c. 266, § 30, as amended by St. 1945, c. 282, § 2.[1] At the conclusion of the Commonwealth's evidence and at the conclusion of all the evidence, the trial judge denied the defendant's motion for a required finding of not guilty pursuant to Mass.R.Crim.P. 25(a), 378 Mass. 896 (1979). In review of those rulings we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v.

---

[1]In pertinent part § 30(1) provides, "Whoever . . . unlawfully, and with intent to steal or embezzle, converts . . . the property of another . . . shall be guilty of larceny . . . ." Section 30(2) defines "property" to include "money [and] . . . a book of accounts for or concerning money . . . due or to become due or to be delivered . . . ."

*Latimore*, 378 Mass. 671, 677 (1979), quoting from and adopting the standard of *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). The reviewing court disregards contrary evidence presented by the defendant and resolves all issues of credibility in favor of the Commonwealth. *Commonwealth* v. *Platt*, 440 Mass. 396, 400-401 (2003). Circumstantial evidence is competent to establish guilt beyond a reasonable doubt. *Commonwealth* v. *Rojas*, 388 Mass. 626, 629 (1983). *Commonwealth* v. *Platt*, *supra* at 401. *Commonwealth* v. *Arroyo*, 442 Mass. 135, 140 (2004). Inferences drawn by the jury need only be reasonable and possible, and not necessary or inescapable. *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). *Commonwealth* v. *Jones*, 432 Mass. 623, 628 (2000). *Commonwealth* v. *Laro*, 68 Mass. App. Ct. 556, 559 (2007).

To establish larceny by embezzlement, the prosecution must prove beyond a reasonable doubt (a) that "the defendant 'fraudulently converted' to [her] personal use," (b) property under her "control by virtue of a position of 'trust or confidence,' " (c) "with the intent to deprive the owner of the property permanently." *Commonwealth* v. *Mills*, 436 Mass. 387, 394 (2002). *Commonwealth* v. *Nadal-Ginard*, 42 Mass. App. Ct. 1, 7-8 (1997). The distinctive gist of embezzlement is the betrayal of the trust placed in the embezzler by the victim. *Commonwealth* v. *Mills*, *supra* at 394. See *Commonwealth* v. *Ryan*, 155 Mass. 523, 526-527, 530 (1892); *Commonwealth* v. *King*, 202 Mass. 379, 391-392 (1909); *Commonwealth* v. *Geane*, 51 Mass. App. Ct. 149, 153 (2001).

The evidence at trial addressed each prima facie element of embezzlement. Under the element of fraudulent conversion for personal use, it permitted the jury to find that, during the span from 1995 to 1998, the defendant had drafted and endorsed checks from the unauthorized account payable to cash in the amount of $72,982; that she had drafted checks payable to her father Tenglund in the sum of $16,031; that she had written other checks in payment of his healthcare, rent, and automobile expenses; and that, with her father, she had exercised one of two ATM or debit cards to withdraw $97,649 from the account.

As to the element of property brought under her control by virtue of a position of trust or confidence, the evidence showed

her to have engaged in uncompensated part-time record-keeping work as of 1992 or 1993, and in full-time compensated book-keeping work for the Metro-West area from 1995 onward. By 1998, MSO's trust in her work had reached a degree permitting her exclusive authority to draft checks on the enlarged section account.

Finally, as to the intention of permanent deprivation, the prohibited character of the telemarketing account, the magnitude of its balance and of the misappropriation from it, the duration of the scheme, and the shortage of any substantial transfers of its funds to the authorized area and section accounts enabled the jury to infer that the defendant and Tenglund had long since passed the point of no return and that they had no intention to restore the diverted funds.

Against this prima facie evidence the defendant asserts two arguments of a doctrinal nature: that her conversion of the telemarketing contribution had not occurred within a relation-ship of trust or confidence with MSO, but rather outside any such relationship, because MSO had expressly forbidden the telemarketing fundraising[2]; and that, therefore, any ownership interest in the telemarketing contributions did not attach to MSO, but rather remained in the individual donors as victims. Neither of these formalistic points avoids the definition of em-bezzlement.

The elements of a fiduciary relationship are the repose of special confidence by the trusting person and the awareness by the trusted person of that special confidence. *Warsofsky* v. *Sher-man*, 326 Mass. 290, 292-293 (1950). *Broomfield* v. *Kosow*, 349 Mass. 749, 754-756 (1965). *Scovil* v. *Mattucci*, 19 Mass. App. Ct. 976, 977 (1985). Restatement (Second) of Trusts § 44(1)(b) (1959). That relationship existed here. MSO's specific prohibi-

---

[2]The defendant summarizes this point in the following passage:

"It is with respect to the moneys obtained by the telemarketing operation that defendant did not have any relationship to Massachusetts Special Olympics. Massachusetts Special Olympics told Mr. Tenglund specifically not to conduct a telemarketing operation and to close out any unauthorized accounts. It had no intention of supporting or benefit-ting from the telemarketing operation. When the moneys were received from the donors, they were working for themselves and not for Mas-sachusetts Special Olympics."

tion of a telemarketing program and account in 1992 did not negate the general course of trusted activity between Caparella and the organization. The elements of embezzlement do not demand that the culprit acquire control of property by conduct strictly within the scope of precisely defined duties. She need only gain control "by virtue of" a position of trust or confidence. *Commonwealth* v. *Mills*, 436 Mass. at 394. The practical question is whether that position enabled the defendant to gain control over the property diverted.

Here the advantages of the defendant's trusted position were pervasive and diverse. Viewed either as an employee or as a long-time volunteer compensated by stipends, she acquired valuable insider knowledge about the operation of MSO. That knowledge (in combination with Tenglund's) enabled her (1) to organize credible solicitation of members of the public for contributions to MSO; (2) to convince persons performing the telemarketing and collecting donations of the genuineness of their work; (3) to assist in the creation of the unauthorized account at a major bank in the role of the "secretary" of "MSO South Central" and by use of the corporation's federal identification number; and (4) to veil the scheme from MSO's central management for approximately six years. These critical advantages come from the knowledge of a trusted, well-situated insider. They belie the notion that she was acting independently of her position because she was committing acts privately forbidden by MSO. Realistically they show that she was exploiting that trusted relationship and not acting outside it.

By statute and by equitable principles MSO acquired a property interest in the telemarketing account sufficient for the ownership requirement of the embezzlement offense. General Laws c. 278, § 9, provides that proof of general or special property interests in whole or in part will satisfy the requirement of ownership in the prosecution of crimes affecting real or personal property.[3] "The purpose of [the statute] 'is to avoid the effect of objections as to the allegation of ownership.' . . . An aver-

---

[3]The full language is highly conceptual.

"In the prosecution of crimes which relate to or affect real or personal estate, it shall be sufficient, and shall not be a variance, if it is proved on the trial that, at the time when the crime was committed, either the

ment and a showing that a . . . property interest in the thing stolen is in someone other than the thief and proof that the thief knew that he had no right to the property taken are sufficient." *Commonwealth* v. *Abbott Engr., Inc.,* 351 Mass. 568, 571 (1967), quoting from *Commonwealth* v. *Kiernan,* 348 Mass. 29, 50 (1964), cert. denied sub nom. *Gordon* v. *Massachusetts,* 380 U.S. 913 (1965). Accord *Commonwealth* v. *Corcoran,* 348 Mass. 437, 439-440 (1965). More specifically, the larceny statute under which the Commonwealth indicted the defendant provides that "[w]hoever steals . . . the property of another . . . shall be guilty of larceny . . . ." G. L. c. 260, § 30(1). To prove the element of "the property of another," the Commonwealth need not prove exact ownership. Rather its burden is to establish beyond a reasonable doubt that the property belonged to someone other than the defendant. *Commonwealth* v. *Souza,* 397 Mass. 236, 238 (1986). These provisions relieved the Commonwealth of the precise attribution of ownership of the embezzled funds to the contributors or to MSO.[4]

As between the two, the equitable principle of constructive trust creates a property interest in MSO. *Mickelson* v. *Barnet,* 390 Mass. 786, 790 (1984) (an embezzling agent becomes a constructive trustee of the money and its traceable proceeds for the benefit of his principal). See *Commonwealth* v. *Corcoran, supra* (same). The present circumstances fit the classic formulation of a constructive trust remedy for the benefit of MSO. A "constructive trust . . . [is] a device employed in equity, in the absence of any intention of the parties to create a trust, in order to avoid the unjust enrichment of one party at the expense of the other where the legal title to the property was obtained by fraud or in violation of a fiduciary relation or where information confidentially given or acquired was used to the advantage of the recipient at the expense of the one who disclosed the information." *Foster* v. *Hurley,* 444 Mass. 157, 167-168 (2005),

---

actual or constructive possession or the general or special property in the whole or any part of such real or personal estate was in the person or community alleged to be the owner thereof."

[4]The contributors' checks would necessarily identify MSO as payee. However, ownership of the donated funds might still require possession and endorsement of the checks for complete "negotiation." See G. L. c. 106, § 3-201(*a*), (*b*).

quoting from *Barry* v. *Covich*, 332 Mass. 338, 342 (1955). The purposeful wish of the telemarketed donors to benefit MSO and the impossibility of individual restitution of their contributions all the more practically reinforce the constructive ownership interest of that organization. Proof of the elements of embezzlement was complete.[5]

2. *Admission of the statement of the joint venturer.* The defendant contends that the trial judge improperly admitted two sets of statements attributed by witnesses to Tenglund. The first set relates to events apparently before April 13, 1993, the date on which the defendant first appears in the course of action as a signatory upon documents creating the unauthorized account. The second set occurred in 1999 after discovery by MSO of the unauthorized account.

Robert Johnson, former president of MSO, testified that Tenglund had told him in the early 1990's that he (Tenglund) had discontinued the telemarketing program with the possible exception of one small component. Louis Sakin, a former MSO area manager, testified that Tenglund had solicited him to become a cosignator for the telemarketing account. The defendant argues that, because these statements may have preceded any involvement of the defendant in a joint criminal venture with her father, they may not qualify as statements of a coventurer admissible against her as an exception to the hearsay rule. See *Commonwealth* v. *Anderson*, 445 Mass. 195, 211 (2005).[6]

Each of two considerations will defeat the argument. First,

---

[5]Against the conviction for false book entries, the defendant makes a short derivative argument: that the independent, nonfiduciary character of the "rogue operation" and the absence of any MSO property interest in the telemarketing account rendered its transactions beyond MSO business and unsuitable for inclusion its records. Because the telemarketing activity and account did reside within the business of MSO, accurate bookkeeping was necessary. In pertinent part, G. L. c. 266, § 67, prohibits any agent, clerk, or servant of a corporation or firm from "omit[ting] to make a true record or entry in any book" of that entity "with intent to defraud." In this instance, it is undisputed that the defendant omitted from the formal books and records accurate entries about the telemarketing account from 1993 to 1998. The jury were entitled to find that she did so with the intent to defraud.

[6]"It is well settled that out-of-court statements by joint criminal venturers are admissible against the other if the statements are made 'both during the pendency of the cooperative effort and in furtherance of its goal.' " *Ibid.,* quoting from *Commonwealth* v. *Colon-Cruz,* 408 Mass. 533, 543 (1990).

the statements do not have the character of hearsay. The Commonwealth was not offering them for their truth. Second, if we were to treat the statements as hearsay, they addressed primarily the history or evolution of the charged conspiracy rather than the specific conduct of the defendant. The prosecution was entitled to submit its version of the formation of the venture for the jury's consideration. *Commonwealth* v. *Rankins*, 429 Mass. 470, 474 (1999). *Commonwealth* v. *McLaughlin*, 431 Mass. 241, 248 (2000). *Commonwealth* v. *Melanson*, 53 Mass. App. Ct. 576, 582 (2002).

Three MSO employees testified that in 1999, after discovery of the unauthorized account, Tenglund had stated to them that he had discontinued the telemarketing program.[7] The defendant maintains that these statements occurred after the close of any joint venture and had therefore become inadmissible hearsay against her. Again, the statements do not have the character of hearsay because the Commonwealth was not offering them for their truth. If, for the sake of argument, we treat them as hearsay, they would qualify as an admissible exception. The testimony of the three employees shows that they received Tenglund's statements in response to their initial inquiry about the previously unknown account, and that those statements attempted to disguise its true character. They were an after-action effort to evade discovery. Concealment constitutes furtherance of the criminal enterprise and brings the statements into evidence against both participants. *Commonwealth* v. *White*, 370 Mass. 703, 708-709 (1976). *Commonwealth* v. *Angiulo*, 415 Mass. 502, 519 (1993). *Commonwealth* v. *McQuade*, 46 Mass. App. Ct. 827, 828-830 (1999).

Beyond the evidentiary objection, the defendant presents a constitutional argument against the admission of the 1999 statements. Because the contention appears for the first time on appeal, we consider it to determine whether a substantial risk of a miscarriage of justice occurred at trial: whether a serious doubt emerges that a different trial result might have occurred with-

---

[7]Former president Robert Johnson testified to such a statement by Tenglund in July of 1999; the former vice-president for marketing and development, Craig Comins, testified to such statements as of April of 1999; and Gail Scola, vice- president for finance, testified to such a statement as of May of 1999.

out the alleged error. See *Commonwealth* v. *Azar*, 435 Mass. 675, 687 (2002); *Commonwealth* v. *Randolph*, 438 Mass. 290, 297 (2002); *Commonwealth* v. *Cash*, 64 Mass. App. Ct. 812, 815 (2005).

The defendant contends that the admission of the 1999 statements by Tenglund violated her right of confrontation under the Sixth and Fourteenth Amendments to the United States Constitution as announced in *Crawford* v. *Washington*, 541 U.S. 36, 68 (2004). The Supreme Court delivered the *Crawford* decision seven days before the commencement of this trial. It held that the confrontation clause of the Sixth Amendment prohibits the admission of "testimonial statements" against the accused unless the prosecution shows that the speaker is unavailable for trial and has been available for prior cross-examination. *Id.* at 53-54, 68. A statement is testimonial, per se, if it arises from judicial hearings, trial, or grand jury proceedings, or from police interrogation. *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 7-9 (2005), 548 U.S. 926 (2006). A statement may become testimonial by circumstance. The test is "whether a reasonable person in the declarant's position would anticipate the statement's being used against the accused in investigating and prosecuting a crime." *Id.* at 12-13. In these circumstances, Tenglund's 1999 statements to MSO supervisors attempted to rationalize the existence of a forbidden monetary account through which his daughter and he had processed hundreds of thousands of dollars over a period of five to six years. He should reasonably have expected that his answers to their inquiries would develop into information for an investigation or prosecution against them. Consequently we shall assume, without deciding, that the admission of his 1999 statements may have constituted hearsay and may have violated the standard of *Crawford*.[8,9]

---

[8]The trial judge had no opportunity to address the issue. The *Crawford* decision was approximately one week old. Defense counsel did not invoke it. The *Gonsalves* refinement lay seventeen months in the future.

Again, we are doubtful that Tenglund's 1999 statements of earlier discontinuance of the telemarketing program constituted hearsay because the prosecution was not offering them to the jury for their truth, but more likely for their untruth.

[9]We assume that Tenglund's privilege against self-incrimination rendered

The ultimate question would remain whether the admission of the statements created a substantial risk of a miscarriage of justice. We have placed the error against the totality of the evidence. That examination leads to the conclusion that it did not materially influence the verdict. See *Commonwealth* v. *Azar, supra* at 687-688. The documentary evidence of the prohibited account from 1993 into 1998 and the aggregate testimony of multiple MSO managerial personnel accumulated to overwhelming proof of guilt without Tenglund's 1999 statements. "Where evidence of guilt is strong and one-sided, it is generally concluded that no substantial risk exists of a miscarriage of justice." *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986). To the same effect, see *Commonwealth* v. *Alphas*, 430 Mass. 8, 14 (1999). Any error was harmless beyond a reasonable doubt. See *Commonwealth* v. *Dagraca*, 447 Mass. 546, 553 (2006) (overriding proof of guilt may render the challenged evidence unimportant to the prosecution's case).

3. *The probationary term of restitution.* The defendant argues that the trial judge's order for restitution violated the principle announced in *Commonwealth* v. *McIntyre*, 436 Mass. 829, 833-836 (2002).[10] Restitution must be rationally related to the convicted offense by causation and amount. The offense must cause the victim's economic loss. The amount should function as compensation for that loss. *Id.* at 834-836. Here the judge made the defendant jointly responsible with Tenglund for restitution of $200,000 through the ten-year period of her probation. She argues that the required rational relationship is absent; that the award to MSO "rewards the wrong party" because that organization had a specific policy against telemarketing. "If [the defendant] had followed this policy and refrained from telemarketing, MSO would be no worse off. Thus MSO's losses bore no relation to the crime charged."

This argument confronts three deficiencies. First, the defendant lacks standing to complain against the court's choice of MSO

him unavailable at the trial of the defendant and unavailable for any prior cross-examination by her counsel.

[10]The defendant does not challenge a judge's general authority to order restitution as a condition of probation under G. L. c. 276, §§ 87 and 87A, and G. L. c. 279, § 1, as confirmed in *McIntyre, supra* at 833.

as the beneficiary of restitution. The money is not hers. It belongs to either MSO or the contributors as interested entities.

Second, the contention rests upon the earlier premise that MSO had no property interest in the telemarketed funds. As we have seen, the equitable doctrine of constructive trust conferred a recognized property interest upon MSO, and therefore a recognized economic loss.

Finally, the judge's order prevented unjust enrichment, conformed to the law, and implemented common sense. The "right party," in the defendant's view, was the body of contributors. The absence of records (attributable to the defendant's misconduct) made restitution to them impossible. The order served their donative intent. The elimination of all restitution would leave the defendant and Tenglund with the benefit of their stolen gains of over $200,000. The criminal conduct undoubtedly caused the loss. The judge calibrated the amount in accordance with the evidence of diverted funds. He allowed a reasonable time for repayment by the two perpetrators. The order was rational and lawful.

*Judgments affirmed.*