COMMONWEALTH *vs.* PETER DEGENNARO
(and thirteen companion cases[1]).

Nos. 11-P-1398 & 11-P-1383.

Middlesex. September 11, 2012. - October 21, 2013.

Present: MEADE, SIKORA, & WOLOHOJIAN, JJ.

*Embezzlement. Fraud. Home Improvement Contractors. Contract,* Construction contract, Trustee. *Escrow. Real Property,* Purchase and sale agreement. *Trust. Practice, Criminal,* Motion for a required finding, Instructions to jury, Presumptions and burden of proof, Findings by judge. *Evidence,* Intent, Presumptions and burden of proof, Joint venturer. *Intent. Statute,* Construction.

This court concluded that the fiduciary embezzlement statute, G. L. c. 266, § 57, applies to the conduct of a contractual escrow agent; accordingly, at the trial of indictments charging, inter alia, fiduciary embezzlement, there was sufficient evidence to establish that the defendant building contractor, whom purchase and sale agreements for the defendant's construction of customers' homes established as an escrow agent, occupied a position of trust created by a written instrument well within the meaning of the statute. [425-429]

At the trial of indictments charging a building contractor with, inter alia, violating the fiduciary embezzlement statute, G. L. c. 266, § 57, the omission of a proposed element from the judge's charge did not constitute prejudicial error, where any misdirection by the judge before the charge did not impair the defendant's fundamental position [429-431]; moreover, the judge's charge did not go beyond explanation of the law or amount to improper fact finding [431-432].

A Superior Court judge did not err in denying a criminal defendant's motion to dismiss indictments charging contractual fraud, where the indictments' substitution of the adverb "willingly" for the more precise "willfully" did not cause meaningful prejudice to the defendant, in that it appeared to be inadvertent, did not alter the substance or meaning of the charge, and did not deprive the defendant of fair notice of the charge. [432-433]

At the trial of indictments charging violations of the fiduciary embezzlement statute, G. L. c. 266, § 57, evidence that the codefendant served as the defendant's bookkeeper and managed the finances and paperwork of his multiple entities, was present at one of the transactions between the defendant and the victims, and wrote checks from the deposits was sufficient to establish the codefendant's role as a joint venturer. [434-435]

---

[1]Eight against Peter DeGennaro, and five against Charlene Connors.

INDICTMENTS found and returned in the Superior Court Department on September 11, 2007.

Ten cases were tried before *Sandra L. Hamlin*, J., and four cases were heard by *Thomas P. Billings*, J.

*Judith Ellen Pietras* for Peter DeGennaro.

*Kevin J. Curtin*, Assistant District Attorney, & *Max Bauer* for the Commonwealth.

*Elizabeth Dembitzer* for Charlene Connors.

SIKORA, J. This appeal requires interpretation of a seldom litigated criminal statute. The defendant, building contractor Peter DeGennaro, engaged through various business entities in the construction and improvement of residential homes. The co-defendant, Charlene Connors, participated in the operations of the entities. At the conclusion of a five-day trial, a Superior Court jury convicted each defendant of five counts of embezzlement of funds deposited with them by two customers. In accordance with purchase and sale agreements presented by the defendants for the construction of homes, the customers had advanced the funds to DeGennaro for placement in escrow accounts. DeGennaro and Connors depleted the escrow funds; the building entities did not perform the promised construction. On appeal, DeGennaro contends, inter alia, that the fiduciary embezzlement statute under which the Commonwealth prosecuted him does not apply to the charged conduct, and that his conduct constituted only a civil breach of contract, not a criminal violation. Connors presents the same arguments and challenges the sufficiency of the evidence of her role as a joint venturer in the charged offenses.[2]

By a separate bench trial of both defendants addressing transactions with different customers, a second Superior Court judge convicted DeGennaro, alone, of four counts of contractor fraud, three for failure to complete contractual renovation of existing homes and one for nonpayment of a subcontractor for materials and services. On appeal DeGennaro challenges the validity of the indictments and the sufficiency of the evidence.

For the following reasons, we affirm all convictions from the two trials.

---

[2]As discussed below, both defendants also attribute error and unfairness to the judge's instructions to the jury.

*Background.* 1. *Jury trial.* The jury received the following evidence. DeGennaro held himself out as the president and manager of three companies: Sun Castles Realty, Inc. (Sun Castles); Hartmann Development, LLC (Hartmann); and Presidential Development Corp. (Presidential). He acted as the directing force and effective alter ego of each of the entities. Connors served as the bookkeeper for those companies, comanager for Hartmann, and signatory for both the Sun Castles and Presidential bank accounts.

Sun Castles maintained a commercial checking account. Hartmann had its own business checking account. Presidential appeared as an alternate holder of the Hartmann account.

a. *Ghafari transaction.* On November 7, 2001, David and Sylvia Ghafari met with DeGennaro to discuss the construction of a new home in Wilmington. They gave him a check in the amount of $5,000 payable to Sun Castles. DeGennaro orally agreed to build the new home. He deposited the check in the Sun Castles commercial checking account.

Over the next month, Connors wrote multiple checks from the Sun Castles account. None related to the Ghafari project. By December 12, 2001, the balance of the account had diminished to $154.36.

On December 14, 2001, both DeGennaro and Connors visited the Ghafaris' home, and discussed and presented a purchase and sale agreement to them. The seller was to be Presidential. The Ghafaris signed the purchase and sale agreement and wrote another check payable to Sun Castles in the amount of $43,500. David Ghafari testified that DeGennaro directed him to "write the check to Sun Castles Realty . . . because it's going to be in an escrow account." When David Ghafari asked about the identity of Sun Castles, DeGennaro answered, "that's me." The Sun Castles account registered the deposit three days later.

In relevant part, the deposit and escrow provision of the purchase and sale agreement stated the following:

> "All deposits made hereunder shall be held, in escrow, by Sun Castles Realty, Inc., as agent for the SELLER, subject to the terms of this agreement . . . . Provided that in the event the ESCROW HOLDER files an interpleader action

as may be required . . . , the ESCROW HOLDER shall be entitled to recover reasonable attorney's fees and costs which may be deducted from escrowed funds. . . . The deposit shall be held in an interest bearing account with all earned interest to be paid to the Buyer."

The purchase and sale agreement listed both the earlier advance of $5,000 and the current one of $43,500 as deposits. The Ghafaris understood the escrow account to be interest-bearing; DeGennaro told them that their money would be "safe" and would "stay in the escrow account." An investigator from the Attorney General's office testified that the $43,500, like the earlier $5,000, entered the Sun Castles commercial checking account and not a titled escrow account.

Both DeGennaro and Connors wrote checks from the Sun Castles account. By the end of December, 2001, Connors had written three checks to herself in the sum of $4,000, and six checks to other entities and individuals in the amount of $20,250. The Sun Castles account records showed continuous activity through the next several months.[3] At times the balance approached zero, and at one point reached a negative $1,557.57. The two defendants signed all checks drawn on the Sun Castles account.

Meanwhile no construction occurred. From May of 2002 to June of 2006, DeGennaro and the Ghafaris executed fourteen amendments to the purchase and sale agreement extending the time for completion of the house and delivery of the deed. Eventually the Ghafaris demanded the return of their deposits with interest. DeGennaro neither returned the money nor built the home.

b. *Daly transaction.* In August of 2002, Maureen Daly contracted with DeGennaro for the construction of a new home, also in Wilmington. On August 15, 2002, she delivered to him a check in the amount of $5,000 payable to Hartmann as an advance toward construction. The deposit appeared on the following day in the Hartmann business checking account.

On August 26, 2002, Daly signed a purchase and sale agreement. The seller was to be Hartmann. On August 27, 2002, she delivered two additional checks: one in the amount of $41,900

[3]The bank records show also sizable unrelated deposits.

payable to Sun Castles and a second in the amount of $7,950 to finance "extras" and payable to Hartmann. Both checks registered on August 27, 2002, in those respective checking accounts.[4]

Also on August 27, DeGennaro wrote a check to "cash" in the amount of $7,290.21 from the Sun Castles account. On the following day, Connors wrote two checks to herself from the same account, one for $3,000 and another for $500. Through the next two months, DeGennaro and Connors combined to write another fifteen checks from the Sun Castles account. The additional checks (exclusive of the first three) totaled over $41,000. The payees on the checks were themselves, "cash," other business entities, and other individuals. None related to the construction of a home for Daly. By October 15, 2002, the Sun Castles account had a negative balance.

During the same time span (August to October, 2002), Connors wrote eight checks on the Hartmann account, and DeGennaro wrote two checks and withdrew $8,500. The total subtractions from the Hartmann account exceeded $17,000. None of them related to the Daly contract. By July of 2003, the Hartmann account had a balance of zero. Daly agreed to two extensions for completion of construction until June 30, 2003. DeGennaro neither built the home nor returned her deposits.

The Daly purchase and sale agreement contained an escrow deposit clause worded identically with the Ghafari clause ("All deposits made hereunder shall be held, in escrow, by Sun Castles Realty, Inc., as agent for the SELLER"), but did not provide for the accrual of interest for the benefit of Daly.[5]

2. *Bench trial.* A second judge received the following evidence in the trial on charges of home improvement contractor fraud. DeGennaro owned or managed an entity known as House Watch of New England LLC (House Watch), which he held out to be a general contractor. During the period of 2004 to 2006,

---

[4]At the moment of deposit, the Sun Castles account had a negative balance of $14,210.18, so as to consume that amount of Daly's advance immediately.

[5]The Daly purchase and sale agreement did not refer specifically to the deposit of $7,950 for "extras" (made the day after its execution). During deliberation the jury by written question asked the judge whether the $7,950 deposit fell within the meaning of the clause's phrase, "[a]ll deposits made hereunder shall be held in escrow." The judge left the question to them as an issue of fact. The jury found that the escrow clause did include that deposit.

House Watch hired Salvy DiCarlo as a subcontractor to provide plumbing, heating, and cooling work for two properties in Reading. Donna and Kenneth Shindelman owned one property; Rob Mark owned the other.

At the Shindelman property, DiCarlo worked on the house and provided the rough materials. House Watch's first payment checks to DiCarlo bounced. DiCarlo met with DeGennaro and Connors; they expressed surprise, and wrote him good checks. He performed further work on the Shindelman house, billed House Watch, but received no further payment. He then broke off his work at the Shindelman house.

For the Mark property, House Watch subcontracted with Di-Carlo to install heating and plumbing. DiCarlo began work, billed House Watch, but received no payment. He telephoned DeGennaro and attempted unsuccessfully to collect payments. House Watch never paid DiCarlo, but he finished the project because Mark decided to pay him directly.

3. *Superior Court dispositions.* In the jury trial on the charges of fiduciary embezzlement of the escrow funds designated by the two purchase and sale agreements, the jury found both De-Gennaro and Connors guilty of five counts, one for each of the deposits received from the Ghafaris (two) and Daly (three). G. L. c. 266, § 57. The later eleven-day bench trial resulted in convictions of DeGennaro alone on four counts of contractor fraud. Three convictions resulted from charges of the knowing and wilful abandonment of, or failure to perform, a contract or project, G. L. c. 142A, § 17(2); the fourth conviction resulted from the knowing and wilful failure to pay for the materials or services provided by a subcontractor, G. L. c. 142A, § 17(14).[6]

*Analysis.* 1. *Applicability of the fiduciary embezzlement*

---

[6] At the conclusion of the jury trial, that judge imposed the following sentence schemes.

1. DeGennaro:

   (a) misappropriation of the Ghafari deposit of $43,500: four to six years in State prison;

   (b) misappropriation of the Ghafari deposit of $5,000: ten years' probation from and after imprisonment;

   (c) misappropriation of the Daly deposit of $7,950: four to six years in State prison, to be served concurrently with the term imposed for the Ghafari embezzlement;

*statute.* At trial both defendants moved for the entry of required findings of not guilty on grounds that the evidence had failed to establish the relationships of trust with the customers required by the fiduciary embezzlement statute for criminal liability. On appeal they argue that the denial of those motions was error. They first characterize their arguments as challenges to the sufficiency of the evidence. However they develop those arguments as contentions of law: that a contractual escrow agent does not qualify as a person of "trust" within the meaning of G. L. c. 266, § 57, and that therefore the evidence of their treatment of the escrow deposits under each purchase and sale agreement was insufficient for verdicts of guilty.

For the following reasons, as a matter of law, we interpret the role of a contractual escrow agent to fall within the meaning of a trusted relationship contemplated by the statute; and, as a matter of sufficiency of the evidence, we conclude that the documentary and testimonial information presented at trial amply permitted the verdicts of guilty under the standard of *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979) (whether "any" rational trier of fact could find each element of charged offenses proven beyond reasonable doubt).

(d) misappropriation of the Daly deposit of $41,900: ten years' probation from and after imprisonment;

(e) misappropriation of the Daly deposit of $5,000: ten years' probation from and after imprisonment; and

(f) as to all misappropriations, probationary restitution in full.

2. Connors:

(a) misappropriation of the Ghafari deposit of $5,000: ten years' probation from and after imprisonment;

(b) misappropriation of the Ghafari deposit of $43,500: ten years' probation from and after imprisonment;

(c) misappropriation of the Daly deposit of $7,950: three to six years in State prison;

(d) misappropriation of the Daly deposit of $41,900: ten years' probation from and after imprisonment;

(e) misappropriation of the Daly deposit of $5,000: three to six years in State prison, to be served concurrently with the other term; and

(f) joint liability for full restitution to all victims.

At the conclusion of the bench trial, that judge imposed sentences of six months in the house of correction for each of the four findings of guilty, to be served after incarceration in State prison and consecutively.

General Laws c. 266, § 57, enacted originally in 1877 and almost unchanged since then, provides in relevant part as follows:

> "A trustee under an express trust created by a deed, will or other instrument in writing, or a guardian, conservator, executor or administrator, or any person upon or to whom such a trust has devolved or come, who embezzles or fraudulently converts or appropriates money . . . held or possessed by him for the use or benefit, either wholly or partially, of some other person or . . . for his own use or benefit or to or for the use or benefit of any person other than such person as aforesaid . . . shall be punished."

The defendants argue that the statute aims specifically at highly formal and intensely regulated relationships of trust of the kind explicitly created by a deed or will or by the appointment of a guardian, conservator, executor, or administrator. They characterize the relationships between the Ghafaris and Daly, on the one hand, and their business entities, on the other, as the less formal and more general activity between a business and its customers.[7] For several reasons we find that interpretation unpersuasive and the statute applicable to their conduct.

First, every substantive term of a statute is entitled to meaningful application so that none becomes superfluous. See, e.g., *Commonwealth* v. *Disler*, 451 Mass. 216, 227 (2008). Here, the relevant language recognizes three classes of fiduciary: (1) an express trustee "created by a deed, will or *other instrument in writing*"; (2) "a guardian, conservator, executor or administrator"; or (3) "any person upon or to whom such a trust has devolved or come" (emphasis supplied). The creation of alternative categories demonstrates a legislative intent to reach a range of trusted relationships. The first category indicates that an

---

[7]Only three published Massachusetts cases have interpreted the statute since 1877. All three deal with more formal trust relationships. See *Commonwealth* v. *O'Connell*, 274 Mass. 315, 317 (1931) (defendant was commissioner appointed by Probate Court to partition real estate); *Commonwealth* v. *Schmukler*, 22 Mass. App. Ct. 432, 432 (1986) (defendant was appointed conservator for incompetent elderly person); *Commonwealth* v. *Garrity*, 43 Mass. App. Ct. 349, 353-354 (1997), cert. denied, 524 U.S. 954 (1998) (defendant was named executor of estate).

express trustee may arise from an instrument more general than a formal declaration of trust (i.e., from an "instrument in writing"). The third category shows a purpose to include unspecified trusted relationships evidenced by a formal document (i.e., "any person upon or to whom such a trust has devolved or come").

Here the purchase and sale agreements established DeGennaro as an escrow agent qualifying as either (1) an express trustee created by an "instrument in writing," or (2) "any person upon whom or to whom such a trust has devolved or come." The Ghafari agreement included two specific indicators of DeGennaro's trusted role: the deposited money was to bear interest for the customers' benefit, and DeGennaro was to employ the judicial interpleader process to resolve any dispute over entitlement to the money, i.e., to preserve and to dispose of the money under direction of a court (including a possible directive to return it to the customer). The Daly agreement included the same interpleader provision.

Finally the role of the escrow agency created by the purchase and sale agreements is telling. We construe a statute "according to the plain and ordinary meaning of its words." *Commonwealth v. Truong*, 78 Mass. App. Ct. 28, 31 (2010). Ordinary, reasonable usage of the concept and term of an escrow agent in a contract refers to a trusted stakeholder of money, property, or other elements of value for the later benefit of interested parties. Decisional law,[8] legal dictionaries,[9] and general dictionaries[10]

---

[8]See *Greater Boston Real Estate Bd.* v. *Board of Registration of Real Estate Brokers & Salesmen*, 405 Mass. 360, 362 n.5 (1989); *Matter of the Discipline of Two Attorneys*, 421 Mass. 619, 627 (1996) (declining to "resolve the scope of an escrow holder's duties in all circumstances," but concluding that escrow holder who wrongfully denies party to escrow portion of funds held in escrow violates "fiduciary duty"); *Kaarela* v. *Birkhead*, 33 Mass. App. Ct. 410, 412-413 (1992) (escrow holder is not agent of either party but is fiduciary of each); *Zang* v. *NRT New England Inc.*, 77 Mass. App. Ct. 665, 671 (2010) (party accepting deposit in escrow account assumes fiduciary duties of escrow agent).

[9]Black's Law Dictionary (9th ed. 2009) defines escrow as "[a]n account held in *trust* or as security" (emphasis supplied).

[10]Webster's Third New International Dictionary (2002) describes as one primary meaning of escrow "a piece of property delivered into the keeping of a third party by one party to a contract or sometimes taken from one party to a contract and put in *trust* to be returned . . . by some other disposition" (emphasis supplied).

describe the trusted character of the escrow officer. One of the layperson's most common contacts with, and understanding of, the escrow function develops, as here, in the agreement for the purchase of a home. In short, DeGennaro occupied a position of trust created by a written instrument well within the meaning of the fiduciary embezzlement statute.

2. *Jury instruction: intent to deprive permanently.* At the jury trial, both defendants argued that the offense of fiduciary embezzlement under G. L. c. 266, § 57, required, as a prima facie element, the intent to deprive the rightful owner permanently of his property. The judge excluded that proposed element from the instructions. On appeal, Connors maintains that position. DeGennaro does not.

It is settled that the crime does not include an intent of permanent deprivation. As itemized explicitly in *Commonwealth v. Garrity,* 43 Mass. App. Ct. 349, 353-354 (1997), cert. denied, 524 U.S. 954 (1998), the elements to be proved beyond a reasonable doubt are (1) that the defendant was a fiduciary; (2) that he possessed money, goods, or property for the use or benefit, either in whole or in part, of another person; (3) that he converted or appropriated the money or property to his use or to the benefit of a third person without the consent of the intended beneficiaries and without the legal right or authority to do so; and (4) that he acted with fraudulent intent.

The definition of fiduciary embezzlement therefore differs from the definition of general embezzlement as a category of larceny codified in G. L. c. 266, § 30. The latter crime, as a species of larceny, does require the intention of permanent deprivation.[11] Larcenous or general embezzlement retains as its distinctive essence the lawful acquisition of property and the subsequent betrayal of the entrustment of the property. See *Commonwealth v. Caparella,* 70 Mass. App. Ct. 506, 510 (2007).

General Laws c. 266, § 57, dispenses with the requirement of the intent of permanent deprivation for several apparent

---

[11]The elements of general embezzlement under G. L. c. 266, § 30, are (1) fraudulent conversion to personal use (2) of property under one's control by virtue of a position of trust or confidence (3) with the intent of permanent deprivation of the rightful owner. See *Commonwealth v. Mills,* 436 Mass. 387, 394 (2002); *Commonwealth v. Nadal-Ginard,* 42 Mass. App. Ct. 1, 7-8 (1997).

reasons. The statute contemplates a formal fiduciary relationship and a correlatively heightened duty of loyalty.[12] Second, the formal fiduciary's misappropriation may often start without an intention of permanence but continue irreversibly toward permanence. The violator may begin a defalcation with the mentality of a borrower and then slide downward into the role of a keeper. See *Commonwealth v. Tuckerman*, 76 Mass. 173, 205-206 (1857);[13] *Commonwealth v. O'Connell*, 274 Mass. 315, 321-322 (1931) (intent to repay is no defense under G. L. c. 266, § 57). See generally *United States v. Young*, 955 F.2d 99, 102-103 (1st Cir. 1992) (discussion of Federal statutory embezzlement). Third, it is likely that a formal fiduciary will encounter repeated and continuous opportunities and temptations to misappropriate, either temporarily or permanently. The response of the case law under G. L. c. 266, § 57, is to criminalize the misappropriation even in the absence of the usual larcenous intent of permanent deprivation.

On appeal DeGennaro no longer argues for a requirement of larcenous intent. He contends, however, that the judge led his counsel to expect the jury instruction to include that requirement as a burden for the prosecutor, and that his counsel relied on such an instruction in closing argument to the jury to his detriment.

Before closing argument, the judge consistently maintained that she would instruct the jury that any intent to return the money would not provide a defense. She did indicate that the instructions might require the Commonwealth to prove an intent of permanent deprivation. The eventual charge omitted that proposed element. DeGennaro's counsel argued to the jury that the Commonwealth carried such a burden of proof.

In the circumstances DeGennaro did not suffer any prejudicial

[12]By contrast, informal and circumstantial fiduciary relationships may arise, as a matter of equitable principle, from (1) one party's trust and reliance on another, and (2) the second party's awareness of that trust and reliance. See, e.g., *Warsofsky v. Sherman*, 326 Mass. 290, 292-293 (1950); *Broomfield v. Kosow*, 349 Mass. 749, 754-756 (1965); *Scovil v. Mattucci*, 19 Mass. App. Ct. 976, 977 (1985).

[13]In *Commonwealth v. Tuckerman*, 76 Mass. at 206, the court wrote: "The intention to abstract the money and appropriate it to his own use has been fully executed; the intention to indemnify and do justice to the party from whom it has been withdrawn remains unexecuted, and may finally, however conscientiously entertained, be altogether defeated."

error. "The failure to give a requested jury instruction is reversible error only if the requested instruction is (1) substantially correct, (2) was not substantially covered in the charge given to the jury, and (3) *concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense*" (emphasis in original). *Commonwealth* v. *Adams*, 34 Mass. App. Ct. 516, 519 (1993), quoting from Smith, Criminal Practice and Procedure § 1846 (2d. ed. Supp. 1992). The judge's charge was entirely correct. Any misdirection before the charge did not impair DeGennaro's fundamental position: that he intended to continue to try to build the house and earn the deposited funds. The judge's ultimate refusal to instruct the jury (incorrectly) of the prosecutor's burden to show an intent of permanent deprivation left him free to pursue that primary defensive theme.

3. *Jury instruction: usurpation of fact finding.* The defendants complain that the judge's instruction on the charge of fiduciary embezzlement went beyond explanation of the law and amounted to improper fact finding. They maintain that the instruction effectively established the presence of an express trust and DeGennaro as a trustee within the meaning of G. L. c. 266, § 57. After review of the charge, we disagree.

As always, we examine "the impact or impression of the charge as a whole upon the reasonably minded juror." *Commonwealth* v. *Baro*, 73 Mass. App. Ct. 218, 220 (2008). A judge always retains discretion to "adapt a jury charge to conform appropriately to the evidence at hand." *Commonwealth* v. *Monteiro*, 51 Mass. App. Ct. 552, 559 (2001). The nature of the charged offense was law-laden. The statute required the judge to explain the meaning of a trust. The evidence, embodied in parts of two contracts, required her also to explain their terms. The judge had a duty to guide the jury through the statutory meaning of a trustee and then the contractual meaning of an escrow agent. She performed the duty without invading the fact-finding function. The following passage, taken from the judge's instructions, in particular illustrates the separation of the law from the facts, and the assignment of fact finding to the jury:

"Now, by calling himself an agent, which is a fiduciary,

the defendant DeGennaro created a relationship with Mr. and Mrs. Ghafari and Mrs. Daly. *So in determining whether the Commonwealth has proven that DeGennaro was a fiduciary* — you've heard the term 'trustee' and you've heard the term 'agent.' *The title itself doesn't determine the relationship.* Rather, it's the relationship created by law and expressed by the parties, as *you find it to be by their actions and words,* that determines whether a fiduciary relationship exists.

"Now, if the Commonwealth *has proved beyond a reasonable doubt* that the defendant DeGennaro in writing agreed to act as a trustee or an agent, to hold in a separate escrow account the money belonging to Mr. and Mrs. Ghafari and Mrs. Daly, then the Commonwealth would have proven that DeGennaro is a fiduciary. So that's the first element."

(Emphasis supplied.)

At multiple other points, the judge emphasized the jury's fact-finding responsibility.[14] She identified the four elements of the statutory offense, stressed three times that the Commonwealth retained the burden of proof beyond a reasonable doubt of all four, and concluded with a supplemental reminder (after sidebar conference with counsel) that reasonable doubt of proof of any one of the elements would require a verdict of not guilty.

4. *Contractual fraud charges.* General Laws c. 142A, § 17(1)-(17), prohibits sixteen categories of misconduct by contractors and subcontractors and submits violations to various civil administrative sanctions and financial liabilities. General Laws c. 142A, § 19, inserted by St. 1991, c. 453, provides that "[a]ny person who knowingly and willfully violates any of the

---

[14](i) "The Commonwealth must prove beyond a reasonable doubt that a defendant was a fiduciary during the relevant period." (ii) "[L]ook at each one of their situations separately to determine whether the Commonwealth has proved beyond a reasonable doubt" its charge. (iii) "So you have to make a determination whether a particular defendant was a trustee or . . . an agent." (iv) "The Commonwealth has to prove in this case that there was a fiduciary relationship in which DeGennaro was under a duty to act." (v) A trustee relationship depends on "manifested intention[s] of the parties." (vi) "You will make a determination" of the trust status by examination of the two purchase and sale agreements.

provisions of this chapter . . . may be punished by a fine of not more than two thousand dollars or by imprisonment for not more than one year or both." By the separate bench trial of multiple charged violations under § 17, the Commonwealth achieved four convictions of DeGennaro. Three rested on violations of c. 142A, § 17(2), the prohibition against abandonment or nonperformance of a contract or project (once undertaken or engaged) without justification. The fourth rested on the violation of c. 142A, § 17(14), the prohibition against wrongful nonpayment of a subcontractor.[15] On appeal DeGennaro contends that deficient language in all of the underlying contractor fraud indictments required the dismissal of those charges and invalidates the resulting convictions.

General Laws c. 142A, § 19, employs the criminalizing phrase "knowingly and willfully." The original indictments charged that DeGennaro had acted "knowingly or willingly." DeGennaro moved to dismiss those counts for failure to state recognized offenses. In response the Commonwealth opposed dismissal and requested leave to amend the phrase "knowingly or willingly" to "knowingly and willfully." A third Superior Court judge (motion judge) denied the motion to dismiss and permitted the Commonwealth to amend the indictments.

The motion judge acknowledged that no Massachusetts precedent precisely governed the issue. She reasoned that the use of a similar adverb appeared to be inadvertent, did not alter the substance or meaning of the charge, and did not deprive DeGennaro of fair notice of it. She cited three reported cases from other jurisdictions in which the courts concluded that the substitution of the adverb "willingly" for the more precise "willfully" did not cause meaningful prejudice to a criminal defendant. See especially *United States* v. *Robbio*, 186 F.3d 37, 43 n.2 (1st Cir.), cert. denied, 528 U.S. 1056 (1999).

For the same reasons, we agree with the motion judge's ruling. It preceded the bench trial by four and one-half months. It did not cause unfair surprise or other prejudice.[16]

---

[15]The judge found DeGennaro not guilty of seven other charges brought under § 17.

[16]As to the fourth count of prohibited practices, the failure to pay a subcon-

5. *Position of defendant Connors.* The Commonwealth prosecuted Connors as a joint venturer actively participating in the five counts of fiduciary embezzlement charged under G. L. c. 266, § 57. On appeal she has employed separate counsel but submitted similar, parallel arguments (1) that the statute is inapplicable to the Ghafari and Daly transactions; (2) that the evidence could not establish her as a trustee of those customers' deposits; (3) that the judge's instructions wrongly excluded the requirement of an intention of permanent deprivation; and (4) that the instructions trespassed into fact finding. For all the reasons recounted already, we reject those arguments.

We have examined the evidence to assure its sufficiency. The jury received evidence that Connors (i) served as DeGennaro's bookkeeper, and (ii) managed the finances and paperwork of his multiple entities. In the Ghafari transaction, she came to their home for the December 14, 2001, meeting at which all four attendees discussed the project, the Ghafaris delivered the $43,500 check, and DeGennaro promised to hold the deposits in escrow. She then wrote numerous checks draining their deposits from the Sun Castles account.

A similar pattern developed in the Daly transaction. Immediately after the deposit of Daly's $41,900 check in the Sun Castles account, Connors began to write checks against the money, including two for a total of $3,500 on the day after the deposit and numerous others over the ensuing two months. She wrote checks also against Daly's separate deposit of $7,500 in the Hartmann account, including additional drafts to herself.

---

tractor for material or services, the testimony of DiCarlo provided the judge with sufficient evidence.

Proof of the offense did not require the Commonwealth to introduce DiCarlo's written agreement with DeGennaro, if any. The language in *Commonwealth v. Geane*, 51 Mass. App. Ct. 149, 153 (2001) (subcontractor's charge of criminally wrongful withholding of money received by general contractor for subcontractor's labor or services requires evidence of written agreement), is inapplicable. *Geane* addressed criminal charges of larceny, *id.* at 149, and not the specific offense of contractor misconduct criminalized here by a different statutory scheme. *Geane* limited the requirement of the written contract to nonpayment for services or labor. *Id.* at 153-154. Here, DiCarlo claimed nonpayment for both services and materials.

Under the standard of *Commonwealth* v. *Latimore*, 378 Mass. at 677-678, ample evidence supported the jury's verdict.[17]

*Judgments affirmed.*

---

[17]The judge accurately instructed the jury on the law of joint venture liability. Under the standard of *Commonwealth* v. *Zanetti*, 454 Mass. 449, 467-468, 470 (2009), the evidence substantiated findings of (1) knowing participation in the charged wrongdoing, and (2) possession of a shared intent to accomplish the offenses.